**144** *NICHOLAS OWENS *v.* WILLIAM D. MILLER and William E. Mayhew, Trading Under the Firm of Miller & Mayhew, C. W. Ford and Others.

*Decided June 19th, 1868.*

Accommodation notes ; discount by drawer ; liability of payee. Mortgage or absolute deed ? defeasance by separate conveyance ; failure to record ; rights of third parties ; actual notice. Deeds ; delivery. Assignments of, choses in action for special purposes. Principal and surety ; security ; subrogation.

The drawer of an accommodation note may discount it, provided there is no usury or fraud in the transaction.   (*a*)          p. 158

Where the payees of accommodation notes obtain from the makers the cash for the notes, less the legal discount, they are in equity and good conscience indebted to them, and bound to pay, or provide for the payment of the debt, apart from the question, whether the makers could or not sustain an action against them directly upon their endorsements on said notes.          pp. 158-9

Under Art. 64, sec. 1, of the Code of Pub. Gen. Laws, where a deed of real estate or chattels, is absolute on its face, but by any other instrument shall appear to have been intended only as a security in the nature of a mortgage, the grantees will lose the benefit which the recording of the deed would have given them, over subsequent *bona fide* purchasers, by neglecting to record the defeasance; but the proposition that the law was designed to annul and make void such an instrument, cannot be sustained for a moment.          p. 159

And a subsequent grantee of the same property, with notice either actual or constructive, of the existence of the first deed, must be postponed to the first grantee, notwithstanding the defect in the recording of the defeasance.   (*b*)          p. 159

---

(*a*)   See *Sauerwein v. Brunner,* 1 H. & G. 326, note (*a*).

(*b*)   See *Alexander v. Ghiselin,* 5 Gill, 104, sec. 3 of note.   As to no-

It is not enough that a deed is in writing and signed and sealed by the grantor; before it can take effect to convey title to the grantee, it must be delivered to and accepted by him.  (c)          pp. 159, 160

*Where the grantee in the second deed, at the time when **145** he was notified of its execution and recording, was also notified or informed of the existence of the former deed for the same property, the notice thus given him was entirely sufficient, and he must be held to have accepted his deed subject to such incumbrance.  (d)       p. 160

Where an assignment of assets and *choses in action* by one partner to another, upon its face shows that it was made for a special and particular purpose, it confers no right upon the assignee to use the assigned property for any other purpose.                         pp. 160-161

It is a well settled principle of equity, that if a principal has given any security or other pledge to his security, the creditor is entitled to the benefit of such security or pledge in the hands of the security, to be applied in payment of his debt.  (e)          ·          p. 161


Appeal from the Circuit Court of Baltimore City.

On the 29th of May, 1852, the appellees, Columbus W. Ford, and Daniel Trowbridge, constituted the firm of Ford & Trowbridge, in Baltimore City.  The appellees, William D. Miller and William E. Mayhew constituted another and a large commercial firm in said city.  Ford & Trowbridge, being pressed for money, applied to Miller & Mayhew for a loan of $4,000; and the latter agreed to lend Ford & Trowbridge their notes for that sum, on the condition that the loan should be secured to them by the conveyance of a house and lot, which Columbus

---

tice from deeds defectively executed, see *Price v. McDonald*, 1 Md. 403, note (a).  But where a paper is not required to be recorded, the recording of it does not operate as constructive notice; see cases cited in *Johns v. Scott*, 5 Md. 81, note (a).  As to the effect of actual notice upon a purchaser under a deed that upon the records is valid and without suspicion of infirmity, cf. *Nicholson v. Condon*, 71 Md. 620; *Diggs v. Mc-Cullough*, 69 Md. 593; *Williams v. Banks*, 11 Md. 198.

(c)  See cases cited in note (g) to *Hutchins v. Dixon*, 11 Md. 30.  And so also with deeds or plats recorded for the purpose of dedicating streets; *Valentine v. Hagerstown*, 86 Md. 488; *Baltimore v. Broumel*, 86 Md. 153.

(d)  See *Boyd v. Parker*, 43 Md. 199; *Abrahams v. Sheehan*, 40 Md.  · 459.

(e)  See *Orem v. Wrightson*, 51 Md. 34; but to be entitled to such subrogation, the surety must have paid the entire debt of the creditor; *Swan v. Patterson*, 7 Md. 164.  The surety has this right, even though at the time of assuming the relation he was ignorant that there were such securities, or even if the securities were taken after the contract of suretyship; *Freamer v. Yingling*, 37 Md. 491.

W. Ford, one of the partners, then owned, at the corner of Baltimore and Carey streets, in said city. Accordingly, on the 29th of May, 1852, Ford executed and delivered an absolute deed of that house and lot, to one Alexander Fisher, with the understanding that he was to hold the same as security for the said loan. This deed was recorded on the 8th of June, 1852; and Miller & Mayhew loaned to Ford & Trowbridge their two notes for $2,000 each, payable eight months after date, and antedated, one April 21st, 1852, and the other April 24th, 1852. In acknowledgment of this loan, Ford & Trowbridge gave Miller & Mayhew their four counter-notes of $1,000 each, payable eight months after date, and dated April 19th, 22nd, **146** *23rd, and 26th, 1852; and Miller & Mayhew gave Ford a receipt for the deed he had executed and delivered to Fisher, certifying that it was held only as collateral security for the payment of Ford & Towbridge's two notes of $2,000 each.

Ford & Trowbridge failing to get the notes of Miller & Mayhew discounted by other parties, applied to them to get the money, by a discount of their own notes; and that transaction was consummated on the 19th of June, 1852, by Ford & Trowbridge, receiving from Miller & Mayhew the sum of $3,859.66, being the amount of said notes, less $140.34, the discount of interest at six per cent. for the time they had to run, and the two notes of $2,000 each were accordingly delivered to Miller & Mayhew. And, at or about the same time, (June 17th, 1852,) Ford obtained the signature of Alexander Fisher, the grantee in the deed, to a receipt for the same of like tenor, with that previously executed by Miller & Mayhew.

Columbus W. Ford, who had pledged his private property, as before stated, for the payment, subsequently, when his firm became embarrassed in its affairs, required for his security an assignment and special appropriation of certain of the assets of the firm to be set aside for the liquidation of Miller & Mayhew's loan, in conformity with an agreement to that effect, made with Trowbridge, when the deed was executed. Accordingly, there being in the hands of Medcalf & Spicer, a private banking house in said city, for collection, $4,670.54 in amount, of accounts due Ford & Trowbridge, supposed to be good, a list of said accounts was made out and on the 28th of August, 1852, the firm of Ford & Trowbridge assigned all

their interest in said accounts to C. W. Ford, *" to be appropriated to the payment of $4,000 against his house, deeded to Alexander Fisher ;"* this assignment was signed *" Ford & Trowbridge."*

C. W. Ford was a member of a certain firm of Ford & Stannard, which was dissolved on the 1st of July, 1845, and was succeeded by a firm of Ford, Stannard & Co., composed of said Ford, one Stannard, and the said Trowbridge, *which **147** was dissolved on the 1st of July, 1850, and was then succeeded by the firm before mentioned of Ford & Trowbridge. The firm of Ford & Stannard, prior to its dissolution in 1845, became indebted to the appellant, Nicholas Owens, in the sum of $3,000; and the debt remaining unpaid, Ford, as a member of Ford & Stannard, *after* its dissolution, to wit, on the 20th of July, 1848, in renewal and acknowledgement of said debt, gave Owens three notes of $1,000 each, signed by Ford & Stannard, payable with interest from date, on demand of one, two and three months respectively.

Ford, who was individually a debtor of Owens, as a member of Ford & Stannard, looking to the embarrassed condition of his own affairs, in August, 1852, became fearful, as he says, that Owens would not get his debt, and made an effort to secure him. Accordingly, after receiving from Ford & Trowbridge, as before stated, the special appropriation of some $4,000 of the assets of that firm to pay Miller & Mayhew's loan of $4,000, so as to relieve his house by means of its payment, from the encumbrance of that claim, he, *of his own motion, and as a voluntary act, without any request by Owens, and without the knowledge of Owens,* on the 31st of August, 1852, executed and put upon record himself, an absolute deed to Owens of the same property which he had previously conveyed to Alexander Fisher. It does not appear precisely at what time Ford notified Owens of the execution and recording of this deed ; but he says that when he did so, *" he notified him of everything in connection with the matter, by which he means that Alexander Fisher had a prior mortgage on the property, but that provision had been made for its redemption."*

Some time after the execution of this deed, to wit, on the 2nd of November, 1852, Ford, with a view of securing also to

Owens the benefit of the assets assigned to him by Exhibit G. in case the same should not be available in time to pay the prior lien of $4,000 due to Miller & Mayhew on the house, applied to

**148**    Robert J. Brent, Esq:, who prepared the *necessary papers for that purpose. Mr. Brent prepared, and Mr. Ford signed, a transfer to Owens, endorsed on Exhibit G., of the accounts therein mentioned, " *for the purposes of my assignment, dated this day, and executed herewith, November 2, 1852.*" And the assignment therein referred to, which was also prepared by Mr. Brent and executed by Ford, in his own name, and in the name of Ford & Trowbridge, Nov. 2, 1852, after reciting the indebtedness of Ford & Stannard to Owens in the sum of $3,000, and that Ford, Stannard & Co. were responsible for the debts of Ford & Stannard to the extent of 95 cents in the dollar; and that Ford & Trowbridge were responsible for the debts of Ford, Stannard & Co.; and that Ford & Trowbridge had made to Ford an assignment of certain accounts (Exhibit G.,) *for the purposes therein mentioned,* then went on to provide as follows: That whereas Owens holds a deed of Ford's house, *which deed is subsequent to a deed of the same property to Alexander Fisher, and subject thereto,* therefore, and in consideration thereof, Ford assigns to Owens all the accounts in Exhibit G., *in trust for the purposes set forth in said previous assignment; and upon the further trust, that if said house cannot be cleared of said deed to Fisher, then to hold said accounts as security for the payment of Owens' said claim for* $3,000. These papers, when executed, were retained by Mr. Brent, and were not notified to and accepted by Mr. Owens until some time after the filing of the bill in this cause, which was done by Mr. Brent on his behalf, at the request of Ford, on the 5th of November, 1852.

The bill in this case was filed November 5th, 1852. It set out at length the claim to Owens, conceded its subordination to that of Miller & Mayhew, furnished the two (Exhibits F. and G.) as the foundation of the claim for relief, alleged the necessity of an injunction against Trowbridge and the appointment of a receiver for the security of the assets assigned by those two Exhibits; and the specific relief prayed by the bill was, " that the accounts assigned to Owens might be applied

*to the purpose of relieving the property of Ford if pos- **149** sible; that the property might be sold and the proceeds applied to pay off the claim of Miller & Mayhew, *and the residue of said proceeds paid to the complainant Owens, etc., etc."*

Under the prayer of this bill, a receiver was appointed of the money and accounts in the hands of Medcalf & Spicer; and the answer of Trowbridge was filed. It conceded all the substantial facts in the bill, touching the loan and securities of Miller & Mayhew, and the subsequent claim of the complainant upon the same. But it denied the allegations of any threat or intention to frustrate the appropriation of the assets as designed, and prayed the revocation of the order appointing the receiver, as injurious and unnecessary. The answer of Miller & Mayhew and Alexander Fisher set up their loan of $4,000 on the security of Ford's house, in the manner hereinbefore stated ; and also stated that Trowbridge, at the time it was made, *notified them of the assignment of assets to Ford for the payment of said loan;* and they claimed the benefit of said security and said assignment; and denied the right of Owens to interfere in any way with either.

On the 26th of August, 1854, Owens filed an amended bill against Miller, Mayhew and Trowbridge. In this he recapitulated his original bill, and charged, as a new discovery, " that the two notes of $2,000 each before mentioned, were either not loaned, as alleged, or if loaned, were never discounted or used by Ford & Trowbridge; that Miller & Mayhew did not pay said notes, but, if loaned, they were in fact returned to Miller & Mayhew; and that, if the notes were in fact loaned and taken up, that Miller & Mayhew had been repaid by Ford and Trowbridge," and that if these averments were true, the deed of Ford's house to Fisher ought to be canceled and released to the complainant, etc.; and an answer *on oath* was demanded of Miller & Mayhew.

On the 8th of September, 1860, the complainant filed a *second* amended bill. In this bill the complainant made the statement, that he had *lately discovered,* that the deed from *Ford to him referred to in his original bill, was an **150** absolute deed,* instead of being, as he supposed, a *mortgage,* and took the ground that the deed under which Miller & Mayhew claimed, was " null and void, and was never legally record-

ed because it was an absolute deed, and yet intended only to operate as a mortgage, as shown by the contemporaneous defeasances. *And that at the time the deed from Ford to him was made and delivered, he had no notice, actual or constructive, of the deed to Fisher."*

Miller & Mayhew, in answer to this amended bill, denied the averment that the deed to Fisher was not legally recorded. They denied that the defeasances were contemporaneous with the deed. They averred that the defeasance of Fisher, the grantee, was not signed until some time after the deed was executed and recorded, and could not therefore have been recorded therewith. They denied the averment that at the time of making and delivery of Ford's deed to Owens, the latter had no notice, actual or constructive, of the Fisher deed. They averred that the making and recording of the deed to Owens, was a voluntary act of Ford without the knowledge or request of Owens. That in the whole transaction, Ford acted as agent for Owens; and Ford's knowledge must be imputed to Owens; and that when Ford told Owens of the deed, he told him all about the prior incumbrance, etc.

The issues on the two amended bills being thus made up, proofs were taken on both sides. The case being heard, the court below, (Alexander, J.,) passed the following order:

This cause standing ready for hearing and being submitted, the solicitors for the respective parties were heard, the bills, answers and all other proceedings were read and considered; and it appearing therefrom, in the opinion of the court, that the securities which are the subject matter of the proceeding, were set aside and assigned to pay the claim due the respondents, Miller & Mayhew, and that the complainant has failed to impeach the *bona fides* of said claim; and it further appearing that the defeasances mentioned in the proceedings, *as showing the deed to Fisher to have been intended only as a security, in the nature of a mortgage, to secure the payment of the claim due to said Miller & Mayhew, were executed some time subsequent to the execution and delivery of said deed ; and it further appearing that the complainant, through his agent, had actual notice of the said deed to Fisher, in the nature of a mortgage as aforesaid. I am further of opinion that the provisions of the Act of 1825, ch. 203, sec. 2,, are

gratified, and the failure to record said defeasances in no wise affects the validity of the claim of said Miller & Mayhew, to the fund in court remaining of the purchase money from the sale of the property described in said deed.

It is thereupon, by the Circuit Court of Baltimore City, this 10th of May, 1865, adjudged, ordered and decreed, that the respondents Miller & Mayhew, are entitled to the proceeds, accounts and claims mentioned and set forth in the assignment from Ford & Trowbridge to them, filed in the cause and marked exhibit G., and to the collections thereof now in the hands of the receiver in the cause, or that hereafter may come to his hands, by virtue of the authority heretofore conferred on him to collect and receive the same, and bring them into court for distribution until they are fully paid the debt of four thousand dollars, mentioned in the proceedings, for the payment of which said accounts were assigned.

And it is further adjudged, ordered and decreed, that in case the proceeds of said claims and accounts should not be sufficient to pay said debt of four thousand dollars and interest thereon in full, that the said defendants, Miller & Mayhew, are entitled in further reduction or payment of their said debt, until the same is fully discharged, to the balance of the proceeds of sale of the property conveyed by Columbus W. Ford and wife to Alexander Fisher, by the deed dated the 29th of May, 1852, filed in the cause; which proceeds of sale are now in this court, or subject to its order, awaiting distribution in case of *Schumacher v. Ford.*

*And that the said complainant under and by virtue **152** of the deed and assignments to him from Columbus W. Ford, filed in the cause, is entitled after payment in full of the debt aforesaid, of the defendants Miller & Mayhew, and subject to such debt or claim, to the balance, if any there may be, of the proceeds of collection of said accounts and claims mentioned in Exhibit G., and the proceeds of sale of the property mentioned in the deed aforesaid, from Columbus W. Ford and wife to Alexander Fisher.

And it is further ordered that William Meade Addison, Esq., the receiver, make and render at once a supplemental report and account of his collections and proceedings as receiver in this cause up to this time, and that the papers and proceedings

in the cause be thereupon referred to the auditor to state a distribution account in conformity with the principles established by this decree.

And it is further ordered, that in conformity with the agreement of solicitors, and in order to facilitate the distribution of the funds covered by this decree, the said cause of *Schumacher v. Ford,* be and the same is hereby ordered to be consolidated with this cause.

From this order the present appeal was taken.

The cause was argued before BARTOL, C. J., NELSON, ALVEY and ROBINSON, JJ.

*R. J. Brent, J. L. Brent* and *Wm. Meade Addison,* for the appellant :

The deed to Owens was made to secure any balance that might remain due to him after the assets in Metcalf & Spicer's hands had been exhausted.

This deed was *absolute* in its terms, and there *was no written defeasance.* The Act of 1825, ch. 203, sec. 2, only covers cases where there are written *defeasances.* The courts have so interpreted it. *Ing v. Brown,* 3 Md. Ch. 521-523. It is in **153** effect a mortgage. Story's Eq. *sec. 1013, etc.; *Ing v. Brown,* 3 Md. Ch. 521; *Chew v. Claggett,* 2 Md. 94. The deed first *duly* recorded has priority. Act 1825, ch. 203, sec. 1.

The execution and registry of a deed confers title upon the grantee, without his being an actor in the transaction. If reference to authorities to establish such a proposition will be excused, the following are cited: *Betts v. Union Bk.* 1 H. &. G. 175; Act of 1825, ch. 203; 1831, ch. 304; *Hudson v. Warner,* 2 H. & G. 415.

The deed to Fisher and the defeasances, taken together, show in effect a mortgage designed to secure the loan of Miller & Mayhew's two notes in favor of Ford & Trowbridge. This means *to secure valid notes—operative, legal instruments.* As the notes never were *used,* they were *inchoate, incomplete* and *void.* They never, in all their career, were in such a relation that a suit could have been maintained upon them. This is the test of the validity of any instrument of writing. It was simply accommodation paper, which never becomes operative until

it gets into the hands of a third party, for some good consideration. *Sauerwein v. Brunner,* 1 H. & G. 477.

This, then, is an attempt on the part of Miller & Mayhew, to make a mortgage executed to secure loaned notes, operate to secure a loan of money. This cannot be done. *Emory v. Gault,* 7 Gill, 405.

*Wm. F. Frick,* for Miller & Mayhew:

Miller & Mayhew loaned Ford & Trowbridge their two notes of $2,000 each, as *accommodation* notes, to raise money on, which Ford & Trowbridge were bound to provide for and pay at maturity to the holders. In performance of a condition precedent to said loan, Ford conveyed his house to Fisher, for the security of Miller & Mayhew, in case Ford & Trowbridge or Ford, should not pay said notes. Miller & Mayhew, at the request of Ford & Trowbridge, *after* said loan, and *before* the maturity of said notes, gave Ford & Trowbridge the *money for them, less the interest at six per cent. for **154** the time they had to run ; and so became the holders thereof. Said notes, not being paid by Ford & Trowbridge, or Ford, Miller & Mayhew are entitled to the $1,300 in court, by consolidation of this case, as the net proceeds of sale of Ford's house.

When Miller & Mayhew loaned these accommodation notes, the *contract* between the parties was this : " The borrower was bound to *provide for the bill when due.* He engages either himself *to take up the note,* or else within a reasonable time before due, *to provide the accommodation drawer with funds for so doing,* or lastly, *to indemnify him against the consequences of non-payment."* Byles on Bills, 184.

If the notes had been discounted for Ford & Trowbridge by a third party, and Miller & Mayhew had paid them at maturity, there could be no doubt about their right to recover on them, as the holders. Wherein lies the difference between their paying them at maturity and advancing the money beforehand, for them ? In both cases alike, the possession of the notes, together with evidence of their *accommodation* nature, constitute the evidence of the holder's claim : not to be rebutted, except by proof, either that the notes were returned by the accommodation borrower, without making any use of

them, at all, or that he had reimbursed and indemnified the lender.

But under this head, the question is one purely between Miller & Mayhew and Ford. It cannot be disputed, that, as between those parties (whether the deed was legally recorded or not,) the conveyance operated as a mortgage to secure the loan of $4,000, to be raised by means of those notes. That Ford, after the discount of them by Miller & Mayhew, and receipt of the money by Ford & Trowbridge, held himself bound to pay them in order to redeem his house, is plain from the fact and language of the assignment of assets of Ford & Trowbridge to himself, which he required in August, *1852. *He,* therefore, clearly could not plead want of consideration for the deed, or that the possession of the notes was not evidence of indebtedness to the holders.

The ground taken by the second amended bill is, that Owens, claiming under a subsequent deed, is not affected by the former, having had neither actual nor constructive notice of it " at the time of the making and *delivery* of the deed to him." If the deed was duly recorded, which depends upon the point whether the Miller & Mayhew receipt ought to have been " recorded therewith," the other (from the grantee Fisher) not having been executed until some time *after* the recording of the deed, he had *constructive* notice. But in order to give him a better standing than Ford occupied, he must show himself to be *a subsequent bona fide purchaser for value, without actual notice.* *Salmon v. Clagett,* 3 Bland, 170, 171; *Hudson v. Warner,* 2 H. & G. 415; *Price v. McDonald,* 1 Md. 414; 1 Story's Eq. secs. 395-397; *Le Neve v. Le Neve,* 2 White & Tudor's Lead. Cas. in Eq. (notes).

It cannot be disputed that he had actual notice of the former incumbrance at the time he first had *any notice at all* of the deed to him. The question is not whether he had notice at the time when the deed, *by relation back,* took effect. It may be true that the acceptance of a deed previously executed and recorded, without the knowledge of the grantee, makes it operate retrospectively from the time of the recording. Nevertheless, the *delivery,* which is necessary to perfect the deed, cannot take place without *acceptance.* Acceptance cannot be made until knowledge is communicated of the existence of the deed. The

presumption that a party will accept a deed because it is beneficial to him, can never be carried so far as to consider him as having accepted it. *Hulick v. Scovel,* 4 Gilm. 159; *Maynard v. Maynard,* 10 Mass. 456; *Sampson v. Thornton,* 3 Met. 275; 4 Kent, 454.

*The *delivery,* therefore, in this case, must be held to **156** be at the period when, for the first time, acceptance could be made; and the notice of the former incumbrance was, therefore, contemporaneous with the delivery, *and the acceptance was subject to it.*

On the other hand, if the deed is to be considered as operative and perfect, at the time of the recording, it can only be on the theory that Ford was the *agent* of Owens; and in that case, the knowledge of Ford is the knowledge of Owens. Now the true view would seem to be this: Ford's house was bound to Miller & Mayhew by his own deed and admissions. His conveyance to Owens was purely voluntary, and not in performance of any promise, without any consideration moving from Owens at the time, and actually without his knowledge. He never *intended* that it should operate to the prejudice of Miller & Mayhew's claim in any way, but that it should be " *subject to it.*" On what theory, then, could Owens take a better title than *Ford's own* equitable title ? He is not a " *bona fide purchaser for value*" of any other, and must be held to be affected with actual notice of all the equities between Ford and Miller & Mayhew. 1 Story's Eq. sec. 408; *Le Neve v. Le Neve, supra.*

The claim of Miller & Mayhew to the fund in the hands of the receiver cannot be seriously questioned.

Nelson, J., delivered the opinion of the court.

The original bill in this case was filed on the 4th of November, 1852. On the 28th of August, 1854, the complainant, by leave of the court, filed an amended bill against Miller & Mayhew and Trowbridge; to this amended bill the defendants answered as they had done to the original bill, and on the 8th of September, 1860, a second amended bill was filed. It will not be necessary to notice particularly the proceedings which were had under the original bill, as the questions for determination

**157** in ·this case arise out of *the case made by the two amended bills. The first amended bill raises several issues, all of fact. They arise upon the charges, first, that the two notes of $2,000 each, were either not loaned by Miller & Mayhew to Ford & Trowbridge as alleged, or if loaned, were never discounted or used by Ford & Trowbridge; that Miller & Mayhew did not pay said notes, but if loaned, they were in fact returned to Miller & Mayhew; and that, if the notes were in fact loaned and taken up, that Miller & Mayhew have been repaid by Ford & Trowbridge. The answers of Miller & Mayhew negative these charges and declare upon oath, as the bill requires, that they did execute and deliver to Ford & Trowbridge the two notes of $2,000 each, and receive in exchange four notes of Ford & Trowbridge for $1,000 each for them. That they did afterwards, at the request of Ford & Trowbridge, discount the said notes for $2,000 each, at six per cent., and give Ford & Trowbridge the money for them, and so held them when they became due; and that they had never been taken up, or paid by Ford & Trowbridge. Trowbridge, the other defendant, answers to the same effect.

At this point the proceedings under the original and first amended bills seem to have stopped. On the 8th of September, 1860, as we have already remarked, a second amended bill was filed by complainant, in which it is charged that the deed to Alexander Fisher from Ford and wife, is absolutely null and void, for the reason that said deed is an absolute deed on its face, whereas it was designed to operate only as a mortgage, as shown by the written defeasances executed by Miller & Mayhew and Alexander Fisher at the time of the execution of the deed, which defeasances were not recorded with said deed. It is also charged, that at the time the deed from Ford to the complainant was made and delivered, he, the complainant, had no notice, actual or constructive, of the existence of the deed to Fisher or. of the defeasances executed by Miller & Mayhew and Fisher. It is further charged that if the deed to Fisher were otherwise valid, it is void as **158** *having been made without 'consideration, or upon a consideration that has failed. The answers of Miller & Mayhew to this second amended bill deny the charges set forth therein, insist on the *bona fides* of the transaction with Ford,

and aver that a full and valuable consideration was given by them for the said deed. They also insist that, at the time the deed from Ford to the complainant was executed and delivered, he, the complainant, had notice of the existence of the deed to Fisher and of the defeasances.

The issues raised upon the first amended bill are issues of fact. The first inquiry is, were the two notes of $2,000 each, loaned by Miller & Mayhew to the firm of Ford & Trowbridge? We think they were; the answers of Miller & Mayhew, which are directly responsive to the charge in the bill, in connection with the testimony of the witness Hawkins, and the entire absence of rebutting proof on the other side, leave no doubt, we think, that the two notes for $2,000 each, were loaned by Miller & Mayhew to the firm of Ford & Trowbridge; and we think it equally clear, looking to the same proof, that the said notes were used by Ford & Trowbridge by their having them discounted by Miller & Mayhew, and their obtaining the money for them. We find no evidence in the record that said notes ever were paid to Miller & Mayhew by Ford & Trowbridge. It is said, that these notes being accommodation notes and having been discounted by the drawers themselves, are void and *Sauerwein v Brunner,* 1 H. & G. 477, is referred to; that was a case which turned on the question of usury, and, we think, has no application to the case before us. In the absence of all authority to the contrary, we are unable to perceive why the drawer of an accommodation bill may not discount it, provided there is no usury or fraud in the transaction. It is manifest from the proof that Ford & Trowbridge obtained from Miller & Mayhew the cash for the two notes, less the legal discount, and whether Miller & Mayhew could or not sustain an action against them directly upon their endorsement *on said notes, they were in equity **159** and good conscience indebted to them, and bound to pay, or provide for the payment of the debt. This objection we think cannot be sustained. The next charge is that the deed from Ford and wife to Fisher is absolutely null and void. This charge is based upon the provision in the Code of Pub. Gen. Laws, Art. 64, sec. 1, which is in the following words: "Every deed conveying real estate or chattels, which by any other instrument or writing shall appear to have been intended only as

a security in the nature of a mortgage, though it be an absolute conveyance in terms, shall be considered as a mortgage; and the person for whose benefit such deed shall be made shall not have any benefit or advantage from the recording thereof, unless every instrument and writing operating as a defeasance of the same, or explanatory of its being designed to have the effect only of a mortgage or conditional deed, be also therewith recorded." We cannot agree with the construction which the complainant gives to this law. That Miller & Mayhew would lose the benefit which the recording would have given them over subsequent *bona fide* purchasers, by neglecting to record the defeasances, there can be no doubt; but the proposition that the law was designed to annul and make void such an instrument we think cannot be sustained for a moment. Granting, then, that the Fisher deed was not duly recorded by reason of the failure to record the defeasances as required by the law; yet, if the complainant, Owens, can be shown to have had actual or constructive notice of the existence of the Fisher deed at the time of the delivery and his acceptance of the deed from Ford and wife for the same property, it is clear, we think, that his deed must be postponed to the deed to Fisher, notwithstanding the defect in the recording. Before we advert to the evidence on this subject, it is important to inquire at what time the deed to Owens took effect, to pass the title to him. It is not enough that a deed is in writing and signed and sealed by the grantor; before it can take effect to convey title to the grantee, it must

**160** *be delivered to and accepted by him. 4 Kent, 454. If, therefore, the deed to Owens from Ford and wife was a voluntary act of Ford, and Owens knew nothing of the execution or recording of the same at the time it was executed and recorded by Ford; and at the time he was first told by Ford of the execution and the recording of said deed, he was also notified or informed by Ford that there existed a former deed for the said property to Fisher, we think the notice thus given him was entirely sufficient, and that he accepted the deed subject to such incumbrance. The proof in the record, we think, sustains this state of the case. Ford, a witness on the part of the complainant, upon his examination being asked: "at the time of the execution and recording of the deed from you to Owens,

had you or not, informed Mr. Owens of the execution of the former deed by you to Alexander Fisher?" replies, "I cannot answer that question positively for this reason: I think the deed was executed and recorded before I notified Mr. Owens of the execution of the deed to him, but as soon as I notified him that the deed was executed, I must have notified him of every thing in connection with the matter, by which I mean that Alexander Fisher had a prior mortgage on the property, but that provision had been made for its redemption."

Being asked, "did you or not, before executing the deed, promise to give Mr. Owens security for his debt?" replies, "I have no recollection of having done so." We think from this proof that, at the time the deed was delivered to and accepted by Owens, he had sufficient notice of Fisher's deed, and that he accepted the deed from Ford, subject to the former incumbrance. We think therefore that Owens was not a *bona fide* purchaser without notice, and that his deed must be postponed to the Fisher deed.

In regard to the assets or *choses in action* assigned to Ford by his partner, Trowbridge, the assignment upon its face shows it was made for a special and particular purpose, to wit: to be appropriated to the payment of $4,000 against his *house, deeded to Alexander Fisher, to secure him, **161** Ford, against the loss of his private property, which he had mortgaged to secure a debt of the firm; this was the sole and only purpose; it conferred no right upon Ford to use these assets in any other manner; it was a trust for one particular purpose, creating no interest in them in Ford, outside of that single purpose. He had, therefore, no right to assign them to the complainant. But supposing his right to make such assignment, the assignment to Owens continues the trust in him by its terms. Owens held, as Ford had held those assets, subject to the equitable lien of Miller & Mayhew to have them appropriated to the payment of their claim. In another view, we think there can exist no doubt of the right of Miller & Mayhew to have those assets applied to the payment of their debt. Ford had mortgaged his private property to secure a debt of the firm of Ford & Trowbridge, and that firm, to secure him from the loss of his private property, and to redeem the same, assigned those assets to him, that he might, in case the firm did not pay,

himself pay the debt and redeem his private or individual property. Thus Ford stood in the attitude of a surety for the firm of Ford & Trowbridge, with those assets assigned to him as a pledge or security to indemnify him from individual loss. It is a well settled principle of equity, that if a principal has given any security, or other pledge to his surety, the creditor is entitled to the benefit of such security or pledge, in the hands of the surety, to be applied in payment of his debt.  1 Story's Eq. sec. 638; *Wright v. Morley*, 11 Ves. 22.  We think this is precisely the condition of the parties to this transaction, and that Miller & Mayhew are entitled to have the funds derived from the sale of the house of Ford, and the proceeds of the assets or *choses in action* applied to the payment of their debt, and that the decree of the court below must be affirmed.

*Decree affirmed.*