# BALTIMORE AND OHIO RAILROAD COMPANY
## *vs.* BENJAMIN M. DEVER.

*Carriers—Liability for Exposing Cattle to Infectious Disease—*
*Pleading—Legal Sufficiency of Evidence of Carrier's Neg-*
*ligence in Not Protecting Cattle from Texas Fever—*
*Evidence—Hypothetical Question—When Testi-*
*mony in Chief Under Deposition Not Ad-*
*missible, Cross-Examination Also*
*Not Admissible.*

A declaration charging that the defendant carrier, a railroad company, negligently permitted the cars in which it transported cattle for the plaintiff, and the pens and yards in which the cattle were fed, to become dirty and infected with germs of disease by which the cattle became infected, is sufficiently definite, and a demurrer thereto was properly overruled.

A plea to such declaration averring that the claim of the plaintiff was based on regulations promulgated under an Act of Congress concerning the shipment of cattle, and that said Act is unconstitutional, is bad on demurrer, since the declaration is based not on the Act of Congress, but on the common law rights and liabilities of the parties.

The carrier of live animals is not liable as an insurer for death or injury to cattle caused by a disease to which they were exposed during the shipment, but is only liable for negligence in exposing them to such disease.

Certain cattle carried by the defendant for the plaintiff in two shipments from Missouri to Maryland were found, soon after delivery, to be infected with a disease called Texas fever. In an action to recover damages therefor, under a declaration charging that the infection was caused by the defendant's negligence during the transportation, the evidence on the part of the plaintiff showed that the cattle in both shipments were certified by Government inspectors to have been in good

health when first shipped; that they were unloaded at the B. yards to be fed and rested, and reloaded in the same cars for further transportation to the place of delivery; that at these yards the cattle were placed in pens used only for animals not coming from an infected territory, which pens were separated from the quarantine pens by an alley twenty feet wide, and also by a dead alley, ten feet wide; that there was a board fence between the two alleys, with an inch space between the planks, and a wire fence between the pens where these cattle were placed, and the dead alley. There was also evidence that Texas fever is caused by fertilized female ticks which, upon dropping off from infected cattle, deposit their eggs on the ground; that after these are hatched into larvæ, they crawl on other cattle and produce the infection by their bite; that these ticks cannot crawl far, but may be carried a long distance by the wind, by other animals, or on the clothing of men; that the proper precaution against infected cattle should be a stone wall or an absolutely tight board fence, six feet high, and that there should be no communication by animals between the quarantine pens and others, as the tick can pass through a small crevice; that the disease was developed in plaintiff's cattle within about the period required for development after leaving the B. yards, and the expert evidence was to the effect that plaintiff's cattle had been infected at these yards. *Held,* that the evidence is legally sufficient to be submitted to the jury to show that the defendant had been negligent at these yards in not taking proper precaution to guard the cattle of plaintiff while there from the danger of infection from the quarantine pens.

When the testimony taken in chief under a deposition is rejected, then the cross-examination on that subject is not admissible at the instance of either party.

When the evidence produced by the plaintiff to show that the defendant negligently exposed plaintiff's cattle to infection by disease at a certain place is not clear and conclusive, the admission of incompetent evidence to show that other cattle subsequently became infected at that place is reversible error.

A hypothetical question put to a veterinary surgeon is erroneous when it assumes that healthy cattle were placed in pens separated from quarantine pens by one alley and a fence not abso-

lutely tight, while the evidence shows that between the two pens there was another alley; and when the question also assumes that the cattle were reloaded from the yards upon cars other than those in which they were carried to it, while in fact they were reloaded in the same cars.

Evidence that Government inspectors were mistaken in certifying that certain cattle were free from disease is not admissible when the question is whether they had given an erroneous certificate in regard to other cattle a year previous.

*Decided January 13th, 1910.*

Appeal from the Circuit Court for Harford County (VAN BIBBER, J.).

*Plaintiff's 10th Prayer.*—If the jury find for the plaintiff, the measure of damages is for the cattle that died, the market value at the place of destination, and for those that were diseased and did not die, the difference between their market value at same place at the time when they arrived there if they had not been diseased, and what they were worth after they were cured or got well of the disease, and such additional expenses and losses as were necessarily imposed on the plaintiff by the injuries caused by the disease to said cattle, and directly attributable thereto. (*Granted.*)

All the other prayers offered by the plaintiff were refused.

*Defendant's 1st Prayer.*—There is no evidence of negligence in this case legally sufficient to entitle the plaintiff to recover and their verdict must be in favor of the defendant. (*Refused.*)

*Defendant's 4th Prayer.*—To entitle the plaintiff to recover under the pleadings in this action there must be evidence tending to prove either: First, That there were Texas fever ticks in the native yards at Belpre; or, second, that there were such ticks in the cars in which the plaintiff's steers were carried; and the jury may not in the absence of other proof, infer that there were ticks in said yards either: First, because Southern cattle were handled at the quarantine

yards; or, second, because there was not a tight board fence between the so-called dead alley and the native yards; or, third, because the steers began to die on the 11th of September; or, fourth, for two or more of said reasons together; fifth, nor may they infer there were ticks in said cars because the said steers began to die on said 11th day of September in the absence of other proof of said facts. (*Refused.*)

*Defendant's 5th Prayer.*—To entitle the plaintiff to recover under the pleadings in this action there must be evidence tending to prove, either: First, that there were Texas fever ticks in the native yards at Belpre; or, second, that there was such ticks in the cars in which the plaintiff's steers were carried; and the jury may not, in the absence of other proof, infer that there were ticks in said yards either: First, because Southern cattle were handled at the quarantine yards; or, second, because there was not a tight board fence between the so-called dead alley and the native yards; or, third, because the steers began to die on the 11th of September; or, fourth, for two or more of said reasons together; fifth, nor may they infer there were ticks in said cars because the said steers began to die on said 11th day of September in the absence of other proof of said facts, unless the jury find that there was no other chance equally as probable for said steers to have picked up Texas ticks so as to have caused their deaths on September 11th and during the week or ten days following. (*Granted.*)

*Defendant's 6th Prayer.*—That it was the duty of the defendant to transport Southern cattle for immediate slaughter, and in so doing to unload them for rest, feed and water, and the jury may not infer negligence on the part of the defendant in respect of its duty to the plaintiff from the fact that it was regularly discharging its duty in so carrying Southern cattle during the summer of 1906. (*Granted.*)

*Defendant's 8th Prayer.*—If the jury find that the infection of the plaintiff's steers from Texas fever ticks might have occurred at other places, and in other ways than at the

Belpre yards, that is to say, either: First, in Barbour County, Kansas, where they originated; or, second, on the cars while being transported to Kansas City yards; or, third, at Kansas City yards; or, fourth, at the St. Louis yards; or, fifth, in the plaintiff's own pastures in Harford County, and further find that the chances for such infection at either of said five places, or in either of said five ways were at least equal to or even greater than the chances of infection at Belpre, then they must find their verdict in favor of the defendant. (*Granted.*)

*Defendant's 9th Prayer.*—Under the pleadings in this case there is no evidence legally sufficient for the jury to find that the plaintiff's steers were infected with the Texas fever ticks by reason of any negligence of the defendant in respect of the cars in which said steers were transported and the jury must exclude the same from consideration. (*Granted.*)

*Defendant's 10th Prayer.*—To entitle the plaintiff to recover he must show affirmatively and by a preponderance of evidence, either: First, that the Texas fever ticks were in the native yards at Belpre at or about the time the plaintiff's steers were fed there; or, second, facts from which it may be inferred with a reasonable degree of certainty that said ticks were in said yards at or about said time, and it is not legally sufficient to infer the presence of such ticks in said yards either from the absence of a tight board fence alone or from the existence of a gate in each of the fences enclosing the dead alley alone, or from both said facts together.

And if the jury find that the deaths amongst said steers on September 11th and thereafter tend to prove that the ticks causing the same might have been picked up at the Belpre yards and also that it was equally possible and probable that they may have been picked up elsewhere, then they must find their verdict in favor of the defendant. (*Granted.*)

*Defendant's 11th Prayer.*—If the jury find from the evidence that the cattle of the plaintiff were delivered to the defendant at E. St. Louis on August 24th and 25th, 1906, for carriage over the Baltimore & Ohio South Western, and its

own road to Stepney, Md., in an apparently healthly condition, then in the performance of its duty of carriage the defendant was under the further duty to and did unload said cattle for rest, feed and water at its yards at Belpre on August 26th and 27th, 1906, and duly delivered said cattle to the plaintiff in an apparently healthy condition on August 27th and 28th, 1906, and if the jury further find that on September 11th, 1906, and thereafter 29 head died of Texas or tick fever at the farm of the plaintiff and elsewhere, then the fact of death from said disease is insufficient to raise a presumption that such disease resulted from the defendant's negligence, even although the jury may further find that said defendant between the first and 28th of August, 1906, may have carried Southern cattle over said Baltimore & Ohio South Western and over its own road and through its yards at Belpre, unless the jury find that in separating the native pens from the quarantine pens the defendant failed to exercise such care as a reasonably prudent man would do. (*Granted.*)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS, PATTISON and URNER, JJ.

*Stevenson A. Williams and Fred. R. Williams,* for the appellant.

*John S. Young* and *Harry S. Carver,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The appellee recovered a judgment against the appellant for damages sustained by him by reason of the alleged negligence of the appellant in the transportation of cattle, which resulted in the cattle contracting a disease known as the "Texas" fever. There are four counts in the declaration which are before us—demurrers to two others having been sustained. The first alleges that the plaintiff on August 23,

1906, placed in charge of the defendant seventy-five head of western steers in good health and condition and free from disease, at Kansas City, Missouri, for shipment to Harford County, Maryland, which the defendant undertook to carry safely and carefully; that said steers reached Parkersburg, West Virginia, on or about the 27th of August, when they were unloaded and fed by the defendant in its yards and pens, and were then reloaded on the cars of the defendant at Parkersburg; that when they were unloaded at Parkersburg to be fed by the defendant, as it was its duty to do, the defendant carelessly and negligently failed to take the proper care and precaution in the pens and yards aforesaid in feeding and caring for said steers, in order to protect them from disease and sickness, as it was required to do, and in consequence thereof they contracted a fever, known as the "Tick" or "Texas" fever, while in the Parkersburg yards or pens of the defendant. It is then alleged that by reason of the fever so contracted, by and through the carelessness and negligence of the defendant, a large number of the steers died after they reached their destination, in Harford County, the plaintiff was put to great expense and labor in caring for others affected with the disease, and was injured in his business as a cattle dealer; that the injury complained of was not due to any fault or want of care on the part of the plaintiff, but was due and owing to the carelessness and negligence of the defendant, by and through its wrongful and negligent acts aforesaid.

The second count alleges that it was the duty of the defendant to provide clean cars for transportation of said steers, and clean pens and yards in which to feed them en route from Kansas City to their destination in Harford County, but the defendant negligently and carelessly permitted its cars in which the steers were shipped, and its yard and pens in which they were fed, to become dirty and charged and affected with germs of disease. This count differs from the first mainly in including the cars as well as

yards and pens, in not naming any particular yard and pens,
and in not naming the disease.

The third and fourth counts were for thirty head of west-
ern steers, shipped from east St. Louis to Harford County—
the third being in other respects substantially as the first, and
the fourth substantially as the second. Demurrers to these
counts were overruled, but we do not find any reversible
error in those rulings, as in our judgment the allegations are
sufficiently definite. The only ground for complaint we ob-
serve is the claim for damages to the plaintiff's business, but
as that was eliminated by the thirteenth prayer, as modified,
no injury was done the appellant by overruling the de·
murrers.

The defendant filed a general issue plea and three special
pleas. The second alleges that the claims of the plaintiff set
up in the declaration are based on an Act of Congress, ap-
proved February 2d, 1903, and upon certain regulations
adopted and promulgated by the Secretary of Agriculture on
March 13, 1903, pursuant to the authority conferred upon
him by said Act of Congress. It is then alleged that the Act
of Congress and regulations adopted by the Secretary of
Agriculture are repugnant to the constitution of the United
States, and in excess of the powers of Congress and of the
Secretary under the constitution. The third refers to an
Act of Congress, approved March 3, 1905, and regulations
made and promulgated by the secretary of agriculture under
that Act and alleges that they were unconstitutional. The
fourth avers that the plaintiff relies on those two Acts of
Congress, and the rules and regulations made and promul-
gated by the Secretary of Agriculture, and alleges that the
Acts of Congress do not authorize, permit or sanction a right
of action for damages, but on the contrary provide that the
parties violating them shall be guilty of a misdemeanor, and
on conviction be punished as set forth in the plea. The
plaintiff demurred to the second, third and fourth pleas, and
the demurrers were sustained. We think they were properly
sustained, ·inasmuch as the declaration shows that the action

was based on the common law rights and liabilities of the
parties, and not upon the Acts of Congress, or upon the rules
and regulations made by the Secretary of Agriculture.

Seven bills of exception in reference to rulings on evidence
are in the record and the eighth embraces the rulings on the
prayers.    The plaintiff offered eleven prayers, but all were
refused excepting the tenth which refers to the measure of
damages.    The defendant offered thirteen—the first, second,
third, fourth and twelfth were rejected, and the fifth, sixth,
seventh, eighth, ninth, tenth and eleventh were granted as
offered, and the thirteenth was granted as modified.    The de-
fendant excepted to the granting of the plaintiff's tenth
prayer and to the refusal of its first. second, third, fourth and
thirteenth prayers—the twelfth not being included in the
bill of exceptions.

It will be well to first consider the extent of the common
law liability of a carrier, if any, for such injuries as are
complained of in this case.    In this State it is settled that:
"In the absence of an express contract, the common law duty
and liability of a common carrier for the safe carriage and
due delivery of live animals are the same as that for the car-
riage and delivery of other property; *the liability in all
cases being qualified by the nature and inherent tendencies of
the thing carried.*    In undertaking the carriage of live stock,
therefore, the carrier assumes the obligation to deliver safely,
and within a reasonable time, having due respect to the cir-
cumstances of the case."    *P. W. & B. R. Co.* v. *Lehman,* 56
Md. 231; *B. & O. R. R. Co.* v. *Whitehill,* 104 Md. 304.    In
*M. & M. Trans. Co.* v. *Eichberg,* 109 Md. 227, it was said,
in considering the validity of a contract with reference to
the burden of proof of negligence, that: "In the absence of
contract, the law makes the carrier an insurer, and as the
goods it carries may be injured or destroyed by many causes
not due to its own negligence or want of care, the carrier is
as much entitled to be paid a premium for its insurance of
their safe delivery at the place of destination as for the labor
and expense of conveying them there."    In *B. & O. R. R.*

*Co.* v. *Green,* 25 Md. 89, and *Fruit Co.* v. *Trans. Co.,* 104
Md. 567, common carriers are also spoken of as insurers.
Some of the cases the appellant cites we do not deem applica-
ble to this case, such as *W. M. R. R. Co.* v. *Shirk,* 95 Md.
649, and *Same* v. *Landis,* 95 Md. 750, and it is not necessary
to enter into a discussion of them. They involved wholly
different questions, the former being for the death of a pas-
senger and in the latter the liability depended upon whether
the injury occurred upon the defendant's road or upon a con-
necting line.

In 6 *Cyc.* 381, it is said: "Where the destruction of or in-
jury to the goods is due to their inherent nature and quality,
or defects therein, the carrier is not liable if his own negli-
gence did not occasion or contribute to the injury. And per-
haps it may be stated, as a general proposition that the car-
rier is not liable for loss happening from the operation of
natural causes. In general, as already stated, a common
carrier of live stock is subject to the same rule of liability as
a common carrier of other goods or property, but if there is
loss or injury due to the peculiar nature and propensities of
the animals, then, under the principle stated in the preced-
ing paragraph, the carrier is excused, unless the loss or in-
jury could have been prevented by the exercise of reasonable
foresight, vigilance and care on the part of the carrier."

Is then the liability of a carrier of live stock to be carried
to the extent of holding the carrier responsible, *as an insurer,*
from death or injury to cattle as the result of a disease such
as this, or shall the shipper be required to prove negligence
on the part of the carrier? We have found no such case,
which has gone so far as to hold the carrier liable without
evidence of negligence, and it would seem to be an unwar-
ranted application of the general common law rule to hold a
carrier responsible for injuries resulting from Texas fever,
merely because the cattle had been carried by it. In 5 *Am.
& Eng. Ency. of Law,* 466, we find this statement: "Inde-
pendently of statutory provisions, a carrier is liable for the loss
of or damage to cattle intrusted to it for transportation, where

the loss or damage is caused by their being exposed to infec·
tion through the carrier's negligent conduct in placing them
with diseased cattle, or in pens or cars where such cattle have
been staying." Another rule is thus stated on page 446 of
that volume: "The liability of the carrier is not confined to .
losses occurring during the time the stock are actually in its
possession. If the cause of a loss occurring after their deliv·
ery to the owner is a cause which began to operate while they
were in the carrier's possession, and is a cause for which it is
responsible, it will be liable without regard to the time when
the effects developed. But in such cases the burden is on
the owner to show clearly that the loss was due to a cause for
which the carrier is responsible." A carrier cannot be held
liable merely because some cattle carried by it die or are sick
fourteen or fifteen days after they are delivered, as a result
of Texas fever, or any other disease, without showing that the
carrier was responsible for their contracting the disease, and
responsibility could not properly attach to it in a case of this
kind unless it was negligent, or had failed in some duty it
owed the shipper. Any other principle would make the
carrier an insurer of the lives and health of the cattle, as
well as having its ordinary duty to safely deliver them at the
point of destination.

In this case the plaintiff relied in his *narr.* on the negli-
gence and carelessness of the defendant, and the Court below
adopted the view we have indicated as the proper one on
that subject. As it rejected the prayers of the defendant
which sought to take the case from the jury on the ground
that there was no lega'ly sufficient evidence of negligence, we
must inquire into that question. In the testimony there is
much very interesting information about the life of the
"Tick" which produces the Texas fever, but we can only
refer to such as may reflect on this case. As we understand
the testimony, the infection is generally introduced into a
section of the country north of the quarantine line established
by the general government by the ticks being on southern
cattle, when they are brought into a non-infected region.

The "seed ticks," as they are called, are minute six-legged parasites, about one-thirty-second part of an inch in size. At that stage they crawl quite actively on the ground and among the leaves, bunching in large numbers on grass blades, shrubs, weeds and fence posts to await an opportunity to attach themselves to their passing "host," as the animal to which they attach themselves is called. Dr. John R. Mohler, Chief of Pathological Division, Bureau of Animal Industry, in the United States Department of Agriculture, is said by the witnesses to be recognized as good authority. In a bulletin prepared by him, and agreed by counsel to be used, he says, "The great length of time required for the appearance of the disease in northern cattle after the passage of tick-bearing cattle through the country (thirty to ninety days) can easily be accounted for by the life history of the tick. It is necessary, before the disease appears, for the fully developed fertilized female to drop off the southern cattle and deposit the eggs, and for them to hatch into the six-legged larvae. These must then crawl upon the northern cattle and insert the micro-parasites they carry through the bites made in the skin in procuring their nourishment. Texas fever follows. It will thus be seen that these females transmit the infection through their eggs to their progeny, and the latter have the power to infect any susceptible animal to which they attach. The disease therefore is not conveyed by the same ticks which take up the infected blood, but only through the generation descending from them."

He said that the time elapsing between the exposure of susceptible cattle to the tick and the appearance of Texas fever depends upon the climate and the development of the ticks to which they are exposed. "Thus, if any Northern animals are placed upon pastures, highways, or in pens, cars, etc., in summer immediately after the premises have been infested with the ticks from southern cattle, Texas fever may occur in from thirty to sixty days. * * * Where northern animals are not exposed in an infested pasture until the ticks which fell from the southern cattle have laid eggs and the

larvae, or seed ticks, are already present, the former cattle
will develop symptoms in thirteen to fifteen days in hot
weather. Thus under natural conditions the disease appears
in thirteen to ninety days after exposure. After the seed
ticks become attached to the animal the disease will appear in
about ten days in summer, and after a somewhat longer
period in cooler weather."

The thirty head of cattle were shipped from the east St.
Louis stock yards on August 24, 1906. They were inspected
there by a Government inspector, and a certificate given that
they were "found free from any symptoms of scabies
(mange) or Texas fever, and may be shipped for stockers."
That certificate was delivered by the appellant to the appel-
lee with the freight bill. They were unloaded at the Park-
ersburg or Belpre yards which belong to the appellant on
August 26th—the yards are at Belpre, across the Ohio river
from Parkersburg. After being fed and rested they were
reloaded and shipped in the same car—arriving at Stepney,
Harford County, on August 27th.

The seventy-five head were shipped in three cars from
Kansas City Stock Yards on August 23, and arrived at East
St. Louis Stock Yards, August 24th, where they were un
loaded. On August 25th, they were reloaded in the same
cars and shipped over the appellant's road. On August 27th
they were unloaded at the Belpre yards, fed and rested, and
reshipped in the same cars arriving at Stepney on August
28th. A similar certificate to that above mentioned was
given at East St. Louis, by the Government inspector, and
was delivered to the appellee by the appellant.

At the Belpre yards, in both instances, the cattle were un-
loaded and placed in what are called the "native pens,"
which are those used for animals not from infected territory.
The native pens are on the east side of the yards, and are
separated from the quarantine pens, which are on the west-
erly side of the yards, and in which infected cattle are placed,
by an alley twenty feet wide and a dead alley ten feet wide.
In August, 1906, there was a board fence on the west side

of the twenty-feet alley (between it and the dead alley), with an inch space between the planks. That on the west side of the dead alley was a wire fence, but in October of that year both of those fences were made tight board fences, and are about six feet high.

Dr. Mohler says in his bulletin referred to, "Although young ticks are very active, neither they nor the adult ticks are capable of crawling very far, but they may be transported long distances by animals, by rains, by winds, cattle cars, hides, and on the clothing of man. Hence the constant danger that tick-free pastures below the quarantine line may become infested with ticks at any time." Dr. Drake, an expert called by the plaintiff, said that at stock yards where they feed cattle which are not infected and also those which are infected with Texas fever ticks, the main precaution should be quarantine or separation, and "to make it effectual it is necessary to have a tight board fence or a stone wall, estimated by the average person, as I think, about six feet;" that the fences should be "absolutely tight with the base boards or the stones underneath the ground and with no intervening spaces left, that is no knot hole, or the allowance of any other animals to communicate over the ground on which these animals pass; no attendants should be allowed unless they take the precaution to change their clothing or wearing apparel." He said: "This small parasite will pass through any of those crevices the same as if there was no fence there"—referring to open spaces and holes in the fences. In answer to a hypothetical question as to when he thought the ticks got on these cattle in controversy, he said it would be safe to deduct a period somewhere about fourteen days before the eleventh of September, 1906,—that being the day the fever was discovered, and when one of the cattle died. Then in answer to another hypothetical question he said there were only two points where the cattle could have become infected, either in transit or at the Belpre yards, and he thought it was at the Belpre yards.

As the Court granted the ninth prayer, instructing the jury that there was no legally sufficient evidence that the steers were infected by reason of negligence of the defendant in respect to the cars in which they were transported, and that they must exclude that from consideration, we are not concerned about that question. Without referring to further evidence, we do not feel justified in saying there was no evidence legally sufficient to be submitted to the jury on the question of negligence at the Belpre yards. Although it may seem singular that the disease can be communicated by such small parasites, moving the distance that these were required to go, there was some evidence tending to show that it could be done. It is not for the Court to determine which of the witnesses were correct, or which the jury should have accepted as the best informed on the subject. We think there was no error in rejecting the defendant's first, second and third prayers, especially with the answers to the hypothetical questions, which we have already referred to in evidence. We will consider those questions later, but as they were allowed to be answered, the answers must be considered in passing on these prayers. The fifth prayer, which was granted, was the same as the fourth, which was rejected, excepting the addition at the end, of which the defendant has no reason to complain. As the Court granted the ninth, there was certainly no injury done the defendant by rejecting its fourth and granting its fifth, as the addition was made to the part of the prayer that referred to ticks on *the cars*. The twelfth is not included in the bill of exceptions, as we have seen. Nor do we see any error in modifying the thirteenth prayer, as was done, as we understand the plaintiff admits his liability for the Baker cattle. Of course unless he is so liable he cannot recover for them, if Baker has paid him. We do not understand the objection to the plaintiff's tenth prayer to be pressed. It is perhaps rather broad in the concluding part. It might be made more definite so as not to mislead the jury.

The first exception was abandoned. The second and third may be considered together. It is true that it was held in

*Little* v. *Edwards,* 69 Md. 499, that one party can use the testimony taken by the other party under a foreign commission, but we know of no case in which testimony in chief on a particular subject was rejected, and then the cross-examina tion on that subject admitted at the instance of either party. It would put counsel in a peculiar position in taking depositions. Counsel on one side may ask questions which the opposite counsel think improper, and if the latter is to be bound by the rule contended for by the appellee, he could not safely cross-examine a witness, because if he succeeded at the trial, in excluding the testimony in chief, his cross-examination might supply what his opponent was unable to prove in chief. On the other hand, if he does not cross-examine, the Court may not adopt his view as to the admissibility of the evidence, and he would not have the benefit of cross-examination. "Where a party uses a deposition taken by his opponent, he makes it his own, and the adverse party has the same right of objection to the questions and answers which he would have had if the deposition had been taken by the party offering it, and is not estopped by the fact that the interrogatories he objects to were propounded by himself." Note in 6 *Ency. of Pl. and Pr.,* 603 citing *Hatch* v. *Brown,* 63 Me. 410. "If a deposition is offered but the answers to the direct interrogatories are for some reason held inadmissible for the offering party, the answers to the cross-interrogatories are equally inadmissible, because otherwise a cross-examination would be allowed with no direct examination preceding." 3 *Wig. on Ev.,* sec. 1893. Of course, we understand that to refer to cross-interrogatories on the subject concerning which those in chief were excluded.

It seems clear, therefore, that a cross-examination in depositions on subjects excluded in chief ought not to be admitted if objected to. It is stated in the exception, that: "Plaintiff's counsel stated he did not intend to read any portion of the testimony ruled out by the Court," but the next question which was read inquired about Mr. Titus, and the third exception was to the question, "at what time did you

investigate to find out when the first symptoms appeared among the Titus cattle?" The witness then goes on to speak of the Titus cattle which had the disease, that the witness saw some of them which had died, that he discovered the tick, etc. That cross-examination was not only improper, as the testimony in chief on that subject had been excluded, but it is manifest that it was well calculated to injure the defendant and, therefore, was not harmless error. The evidence of the plaintiff was by no means conclusive, to show that the disease which resulted in injury to the plaintiff was contracted at Belpre, but when testimony in reference to the Titus cattle was admitted, it in all probability had a decidedly improper effect on the jury, although those cattle were at Belpre after the plaintiff's were shipped. We think, therefore, there was error in admitting the cross-examination on that subject.

The fourth and fifth bills of exception embrace the hypothetical questions asked Dr. Drake. The one in the fourth is not so objectionable, although it is defective because it erroneously assumes that the seventy-five cattle were reloaded at East St. Louis in other cars, but the fifth is decidedly and materially defective. Dr. Drake answered that question by saying that the cattle became infected at the Belpre yards. There are several material omissions in the question which we will mention. In the first place, it assumes that the cattle were "reloaded in other cars," while the proof is that they were reloaded on the cars in which they were brought from Kansas City. They were Chicago and Alton cars, No. 29290, 28117 and 28238, and the papers offered in evidence by the plaintiff show that the cattle went through on the same cars. The freight bills given to the plaintiff, and offered by him, also show that they were so shipped. Dr. Drake on cross-examination showed that he understood that the cars were changed. He, as well as other witnesses admitted, that cattle may become infected on cars, as well as in the yards, and hence it was a question of some considerable importance, as these cars had come from Kansas

City,-belonged to and were brought to East St. Louis by another company.

But there is a still more serious objection to the question. Part of it assumes "that the fences which divided the alleys that southern cattle passed up and down from the alleys that native cattle passed up and down at the yards at Belpre, O., were open, were not tight, from the ground to their height five or six feet from the ground." There is not one word in the question suggesting that there was a dead alley ten feet wide between the two alleys—on the contrary, the inference which might be drawn is that the alleys were contiguous. It is a very important fact, as the ticks could get through the fences more readily than they could get over the alley, and through the two fences. The fences are described in the question as just what Dr. Drake said they ought not to be, and although that was a most material part of the hypothetical question, no allusion is made to the dead alley ten feet wide. Some other objections to the question were made by the appellant, but we do not deem it necessary to discuss them. The evidence is very indefinite as to which alley in the stock yards these cattle were taken in, when they were unloaded at Belpre. If they were not driven through Alley No. 5, they were, so far as the evidence shows, not closer to the quarantine pens than thirty feet, as that alley is twenty feet wide, but we have assumed in passing on the exception that they were driven through Alley No. 5.

We do not see the relevancy of the testimony in the sixth and seventh bills of exception. If it be true that a Government inspector made a mistake in June, 1907, it cannot reflect on this question. It is altogether probable that inspectors may make mistakes at times,—indeed it would be remarkable if they did not, when dealing with such small parasites as these, and if the cattle show no signs of being infected by the disease, or are not known to have been in infected territory, the inspectors would not probably be as rigid in some cases, as might be necessary in order to detect unsuspected ticks. But specific instances occurring nearly a

year after the time the jury was considering could furnish no reliable evidence to guide them.

For errors in the rulings presented by the second, third, fourth and fifth bills of exception, and referred to above, the judgment will be reversed and a new trial awarded.

> *Judgment reversed and a new trial award-*
> *ed, the appellee to pay the costs.*