BLOECHER & SCHAAF, INC., *v.* PENNSYLVANIA RAILROAD COMPANY.

[No. 45, January Term, 1932.]

*Decided April 28th, 1932.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Joseph W. Starlings* and *George Washington Williams,* for the appellants.

*Edward E. Hargest, Jr.,* with whom were *O. Bowie Duckett, Jr.,* and *Adams & Hargest,* on the brief, for the appellee.

Pattison, J., delivered the opinion of the Court.

The appeal in this case is from a judgment for the appellee, the defendant below, the Pennsylvania Railroad Company, recovered in a suit brought against it by the appellant, Bloecher & Schaaf, Inc.

The first count of the declaration alleges that the plaintiff, on or about the 2nd of June, 1930, delivered to the defendant, a common carrier of live stock, at the National Stockyards, Illinois (in East St. Louis), 166 hogs "in good condition," to be transported to the consignee, the plaintiff, at Baltimore, Md., "within reasonable time from the time said shipment was delivered to the said defendant, as they were in duty bound to do, and that when said car arrived at the destination * * * there was one hog missing, twenty-four hogs were dead, and three hogs were in such bad condition they were condemned by the Health Department of the City of Baltimore, and the remainder of said hogs were in a greatly damaged condition."

The second count of the declaration alleges that: "The defendant delayed the transportation of said 166 hogs and by reason of the defendant's negligence and unreasonable delay the said 166 hogs were not delivered on the day when they should have been, and were greatly depreciated in weight and appearance by the length of the delay, and the said shipment of hogs was otherwise greatly damaged *in transitu,* all of which was due to no fault on the part of the plaintiff."

In the trial of the case four exceptions were taken to the rulings of the court upon the evidence, and one upon the prayers. The plaintiff offered five prayers, all of which were refused. The defendant offered four prayers; of these the third was granted as offered and the fourth granted as amended. In addition thereto, the court granted what is designated as "court's original instruction." The plaintiff excepted to the rejection of its prayers and to the granting of the defendant's third and fourth prayers; also, to the "court's original instruction."

The facts of the case are substantially these: The appellant

delivered to the defendant to be transported over its road, starting from the stockyards in East St. Louis, 166 hogs of the average weight of 142 pounds, making a total weight of 23,600 pounds. The cost of these hogs to the plaintiff was $10.35 per hundred weight, or a total of $2,452.60. They were shipped in what is known as a double-decked car, and were loaded under the supervision of the shipping clerk of the stockyards, who testified that at the time of their shipment the hogs were "in apparent normal condition." These hogs were purchased for the appellant by one Murray Watkins, a buyer at the stockyards in East St. Louis. He testified that he sorted the hogs and weighed them before shipment, and ordered them sent to the shipping department some time between 12.30 and 2 o'clock p. m. of June 2nd, 1930; and "that they were loaded about two-thirty to three o'clock," and that they were "pulled away from the loading chute at three-thirty p. m." on that date; that the hogs were in good condition and "were one hundred and forty-two (142) pounds average and good quality."

In the deposition of Albert P. Boneau, lay inspector for the United States government in the Bureau of Animal Industry, National Stockyards, Ill., whose duty it was to inspect all hogs for outbound shipment, including the hogs in question, he testified that "he was able to report that they were in apparently good health"; that his inspection was made "by observation and by standing and looking at the hogs as they are loaded."

The contract of shipment in this case contained the following provisions:

"Sec. 1. (a) Except in the case of its negligence proximately contributing thereto, no carrier or party in possession of all or any of the live stock herein described shall be liable for any loss thereof or damage thereto or delay caused by * * *, the inherent vice, weakness or natural propensity of the animal. * * *

"(b) Unless caused by the negligence of the carrier or its employees, no carrier shall be liable for or on account of any injury or death sustained by said live

stock occasioned by any of the following causes; over-
loading, crowding one upon another, * * * heat or cold,
changes in weather or delay caused by stress of
weather, * * * or other causes beyond the carrier's
control."

The freight bill for the shipment of these hogs, which was
admitted in evidence without objection, does not show at
what time the car containing the hogs left the National
Stockyards. However, it does indicate the following: That
the hogs were fed, watered, and loaded at 3 o'clock on the
2nd of June, 1930; at 11.15 p. m. on June 3rd, upon the
arrival of the car at Pittsburgh, the hogs were unloaded,
yarded, and put in the pen for feed and water and rest for
over two hours and a half; at 5.05 a. m. on June the 4th,
they were reloaded and taken to Marysville, Pa., where they
were again unloaded at 2.45 a. m., June 5th, and given rest,
water, and feed; they were reloaded at 8 a. m. of the same
day; and arrived at Gwynn's Run, Md., at 6.15 a. m., June
6th.

The freight agent of the defendant in Baltimore, Gwynn's
Run Station, and Union Stockyards, testified that "the usual
run of the train from St. Louis to Baltimore was three days;
that they usually arrive here the third morning, which is a
tentative run"; that "this particular train leaves the stock
yards at East St. Louis at around 3 p. m. and is known as the
Greyhound, and that it is regular live stock train and that
the schedule is in printed form to reach here the third morn-
ing." The hour of the car's arrival was usually from 6 to 8
o'clock; and the hogs in this case would ordinarily have
arrived between those hours on June 5th. Generally there
was no unloading of the hogs in Marysville, but at Pittsburgh
only, and the unloading at Marysville in this case consumed
additional time.

Upon arrival of the hogs in Baltimore, one hog was miss-
ing, twenty-four found dead, and three were condemned
by the health department. The missing hog is accounted for
by the fact that one died in the unloading of the hogs at

Pittsburgh, it being said that its death was the result of suffocation. No *post mortem* was made and no explanation was given for the cause of the death of the twenty-four hogs, nor was any reason given why three were condemned.

The total weight of the dead and condemned hogs was 2,920 pounds, for which the plaintiff was paid by the Union Rendering Company, Inc., to whom the hogs were sold, one cent a pound, or $29.20. They were likewise paid the sum of $1.40 by check of the Pennsylvania Railroad Company for the hog that died at Pittsburgh.

It is further disclosed by the record that the average shrinkage of a hog when shipped from East St. Louis to Baltimore, arriving there on the third day, is from nine to eleven pounds per hog; that, in this case, the shrinkage was something over eighteen pounds to the hog. The prevailing price in Baltimore of hogs of this character in June, 1930, was $11.40 per hundred pound.

As we have already said, the hogs were loaded at East St. Louis at 3 p. m. on June 2nd; they arrived in Pittsburgh at 11.15 p. m. on June 3rd, thirty-two hours and fifteen minutes thereafter. After being watered, fed, and rested at Pittsburgh, they were reloaded at 5.05 a. m. on June 4th, five hours and fifty minutes after their arrival. They arrived at Marysville, seven miles west of Harrisburg, at 2.45 a. m. on June 5th, after a trip of twenty-two hours and forty minutes. The hogs were reloaded at Marysville five hours and fifteen minutes after their arrival, at 8 o'clock a. m. At this place, as testified to by Kocher, defendant's employee, the hogs, when reloaded, were in "good condition."

Hardesty, a conductor on the train from Enola, a station six miles from Marysville across the river from Harrisburg, to Baltimore, testified that the car in which the hogs were loaded, and which was a part of his train, left Enola yards at 8.05 p. m., June 5th, or more than twelve hours after the departure from Marysville, only six miles away.

The court's original instruction was as follows:

"If the jury find from the evidence that the plaintiff's agents delivered and the defendant accepted a car load of

hogs for transportation from East St. Louis to Baltimore, that under the contract of carriage exhibited in evidence it was the duty of the defendant railroad company to exercise ordinary or reasonable care and diligence under all the circumstances of the case, to do the following things:

"(a) To protect the said hogs when in transit from injury; and

"(b) To deliver the said hogs with reasonable promptness at Baltimore.

"The jury is further instructed that the defendant railroad company is not an insurer of the property of the plaintiff, and is not responsible for the death of or damage to said hogs due to the weather conditions or other conditions beyond its control, if the jury so find.

"Therefore the verdict must be for the defendant, unless the jury shall find from a preponderance of the evidence:

"(c) That the defendant railroad company in and about the transportation of said car load of hogs failed to exercise ordinary or reasonable care and diligence in the treatment of said hogs on route, or

"(d) Failed to use ordinary care and diligence to transporting said hogs without unnecessary delay, and

"(e) That as the natural and proximate result of said negligence upon the part of the defendant (if the jury find the defendant was negligent as aforesaid) some of said hogs died, and/or some of them were made sick, and/or some of them made an abnormal loss in weight, then the verdict must be for the plaintiff."

This instruction is regarded by both the appellant and the appellee as placing upon the plaintiff the burden of proving the negligence of the defendant. The appellant contends that the instruction is bad because of such fact, while its correctness is sought to be upheld by the appellee on the ground: (1) That there is evidence in the record tending to show that the death of the hogs and the defective condition of those condemned was the result of disease, and as a result thereof the burden shifted; and (2) that by a proper construction or interpretation of section 1 (b) of the bill of

lading, hereinbefore set out in full, the burden of establishing the negligence of the defendant was upon the plaintiff.

It is said in 4 *R. C. L.,* p. 993, secs. 460 and 461: "In an action against a carrier by a shipper to recover damages for loss or injury to live stock the burden of showing that the stock was injured while in the possession of the carrier is with the shipper. But when a loss or injury happens to live stock in the possession of a carrier for transportation the burden of proof rests on the carrier to exempt himself from liability; for the law imposes on him the obligation of safety. The owner or shipper is bound to prove no more than that the stock were delivered to the carrier, and the failure to deliver them safely. These facts are *prima facie* evidence of negligence or misconduct. Where the injury is physical a shipper will satisfy the rule requiring him to show an injury to his stock before the burden is cast on the carrier to exonerate itself, by establishing that the stock were delivered in good health and condition and redelivered by the carrier in an injured condition, but where the injury claimed is sickness a shipper does not satisfy the rule unless he goes further and shows that the illness was contracted as a result of the negligence of the carrier." See *Balto. & O. R. Co. v. Dever,* 112 Md. 296, 75 A. 352. "While the burden of proof rests on a shipper of live stock to show that the stock were in good condition when received for transportation by the carrier, yet it is settled by weight of authority, that where the shipper was not required to accompany the stock during transit either in person or by agent, and the shipper has shown loss of or injury to his stock while in the custody of the carrier, the burden of proof is on the carrier to show that such loss or injury did not result from any negligence on its part, or that the cause of the loss or injury was within one of the excusatory exceptions recognized by law." 4 *R. C. L.,* sec. 461. See *Atlantic Coast Line R. Co. v. Rice,* 169 Ala. 265, 52 So. 918.

The defendant, in support of its contention, cites the case of *Illinois Central R. Co. v. Word,* 149 Ky. 229, 147 S. W. 949, 950, in which the court said:

(1) "Where the live stock is accompanied by the owner or his agent or representative, and injury results while in transit, the burden is upon the owner to show how the injury occurred; that is to say, that it was due to some negligence of the carrier."

(2) "Where the live stock is not accompanied by the owner or his agent or representative, and injury results in transit, it is incumbent upon the owner to show that the stock, when delivered to the carrier, was in good condition, and when received from the carrier at its destination was in a damaged or injured condition. Thereupon the burden shifts, and it devolves upon the company to show that the cars in which the stock was shipped were in good condition and suitable for that purpose, were handled with reasonable dispatch, and were not subjected to any rough or improper treatment during the journey, and the company, in addition, must satisfactorily account for the injured condition of that stock; and, unless the carrier can show that such injury is due to some inherent vice of the animal, the fact that it is injured will be accepted as *prima facie* evidence of negligence on the part of the carrier."

(3) "These rules of practice apply to all cases where death or injury, for which a recovery is sought, results from some external agency; but, where a recovery is sought for sickness of live stock in transit, or for death resulting from sickness, the burden does not shift, but remains all the while upon the plaintiff; for the sickness, or death from sickness, of the animal may be due to a diseased condition existing at the time of or prior to its shipment, though undiscovered by its owner or the carrier, or may be due to atmospheric, climatic, or other conditions over which the carrier has no control, and for which it would, in no event, be responsible."

The law is, we think, correctly stated in that decision.

It is the contention of the appellee that this case falls within that class of cases "where a recovery is sought for sickness of live stock in transit, or from death resulting from sickness." This is based solely upon the evidence of Dr. W. J. Embree, a veterinary surgeon of Chicago, an expert

witness offered by the defendant. He testified: "It (the hot weather) is not so very hard on hogs of this weight. The condition sounds to me a good deal more like some disease, I might say necrotic enteritis or influenza or some disease of that kind. I cannot hardly make a hot weather proposition out of it. The fact that there were three of them condemned, as it were, if they had got in here a day sooner probably the whole twenty-four would have been condemned. There is that possibility." Upon being asked by the court what enteritis was, the witness replied: "Enteritis is inflammation of the bowels; that necrotic enteritis is an inflammation that is caused from a necrosis bacillus that a pig will pick up and carry with it for a long time, and then under certain conditions at certain times it may kill several of the herd; that it is an infectious disease, but not contagious; that animals will catch it in the same spot or place, but it would not be apparent from a casual observation of the hog, absolutely not."

This evidence was elicited by the court against the objection of the plaintiff, though no exception was taken thereto. In it the witness attempts to say, though with no certainty whatever, but in a conjectural way, that the hogs that died and those condemned were affected by some disease, necrotic enteritis, influenza, or some disease of that kind, or at least it sounded more like that to him than the effect of hot weather. He never saw the hogs, made no examination of them, and he heard from no witness how the hogs were affected. There was no *post mortem* examination. The appearance or condition of the bowels and intestines of the hogs, which he said would be affected by the disease, was unknown to him; and he was speaking without any knowledge from any source of the actual condition of the hogs that would enable him to state whether or not they were affected by any disease. This evidence was lacking in probative force and utterly failed to show that the hogs were infected with disease. It was, we think, legally insufficient as tending to show that the hogs were affected by disease, upon which depended the shifting of the burden of proof. There was, how-

ever, a *post mortem* examination of one of the hogs shipped, the one that died while being unloaded at Pittsburgh. The examination in that case showed that the hog died, not from disease, but from suffocation.

The other contention of the defendant that section 1 (b) of the bill of lading, when properly construed, places the burden upon the plaintiff, is, we think, without force. This section of the bill of lading provides that the carrier shall not be liable for injury or death to live stock in transit resulting from the causes therein named, unless caused by the negligence of the carrier or its employees. We do not find in this provision anything to warrant the interpretation or construction that the burden of proof is thereby shifted, or that it was intended to have that effect. It simply states the liability of the carrier without saying upon whom the burden of proving the negligence of the defendant should be imposed. *Hull v. Chicago, St. P., M. & O. Ry. Co.*, 41 Minn. 510, 43 N. W. 391.

If the court's original instruction placed the burden of proof upon the plaintiff, as thought by the parties to the suit, then we think it was wrongfully granted; and if it did not have that effect, then the plaintiff was entitled to have the jury told upon whom the burden of proof rested, and its second prayer should have been granted, as we find no objection to it. Nor do we find any serious objection to the plaintiff's first and first and one-half prayer.

The third prayer is upon the measure of damages. This prayer instructs the jury that if they find for the plaintiff the measure of damage fixed by that prayer applies to all twenty-eight hogs dead and condemned, including the hog that died at Pittsburgh. The jury in its finding may have reached a different conclusion in respect to the liability of the defendant as to the hog that died at Pittsburgh. Yet by the prayer the plaintiff was to be compensated alike for injury or loss of all of said hogs. If for no other reason, we think this prayer was bad.

The plaintiff's fourth prayer, offered in conjunction with the plaintiff's third prayer, which we hold bad, should not

have been granted in the form in which it was presented,. even if otherwise held good.

The defendant's third prayer is, we think, a correct statement of the law applicable to the case.

In defining the duty of the carrier, the defendant's fourth prayer, which was amended by the court, stated that the carrier "was only bound to exercise reasonable care to transport and to protect the said hogs from injury * * * while they were in its custody." It was also the defendant's duty to transport the hogs with reasonable dispatch, and as delay was one of the alleged and outstanding causes for the damages said to have been suffered by the plaintiff, this element of duty should have been clearly stated in the prayer.

In the course of the trial, the butcher and foreman at the plaintiff's plant in the City of Baltimore was asked by the plaintiff's counsel: "What was the condition of the 141 hogs. when you unloaded them?" This question was objected to,. and the court in passing upon the objection said: "Do you mean by that that they had cholera or that they were crippled or that they were overcome by heat or that they gorged themselves at Marysville and had gotten the colic, or the million and one ills to which hogflesh is heir? It seems to me it is. necessary for you to direct the witness' attention to some one or more of the things which may be attributable to the twenty-four hours' delay in transit. It is perfectly conceivable that every one of those hogs might have died in transit without any fault on the part of the railroad whatsoever or without any reference whatsoever to the fact that it took them an additional twenty-four hours plus the mileage to get here." The court sustained the objection. Witness was then asked:. "Were any of that number unable to walk out of the car?" There was an objection to this question, and the objection was sustained; the court saying: "Well, I think the objection well taken, because I notice on the paper which you exhibited in evidence that the railroad company is absolved from responsibility for overcrowding, goring, gouging and a variety of other forms of assault." There was an exception noted to this ruling of the court.

After the court had ruled that the question was an improper one, the witness testified that "he did not know if any of the 141 pigs died of disease within twenty-four hours; that none were suffering from disease at the time they were unloaded, so far as he knew; that three hogs were put in a cart at the time of the unloading and hauled to the slaughter place * * * and could not walk." It would therefore seem that the witness was subsequently permitted to answer the question excepted to; consequently the ruling of the court was not hurtful to him. In the course of the cross-examination of this witness, the court said: "Just in the interest of truth and not caring who wins this case, at the time these hogs were in transit and arrived at your place was not the weather unduly hot?" Answer: "Yes."

On redirect examination, the counsel for the plaintiff asked the witness if the hogs had been drenched. This question was objected to and the objection was sustained and an exception noted. It was in evidence that in very hot weather the hogs were drenched to cool them off. We see no serious objection to this question; but as the witness was not with the hogs during transit, but in the plaintiff's shops at Baltimore, he had no personal knowledge of such fact, and was not in a position to answer the question.

The third exception was to the court's ruling in refusing to require the defendant to produce certain papers that he was called upon by the plaintiff to produce, showing shipments of hogs in the preceding month of May, 1930. What these papers contained, and the purpose for which they were to be offered in evidence, are not disclosed by the record, and thus we are unable to say that they were improperly excluded.

The fourth exception is to the exclusion of a question asked the vice-president and treasurer of the plaintiff company: "How do you account for the shrinkage of eighteen plus on this load of hogs when the average shrinkage when delivered in time is from, as you stated, nine to eleven pounds per hog?" The witness had been allowed to testify without objection that the shrinkage in pounds of the hogs in question was something over eighteen pounds, while the ordinary

shrinkage of hogs of their size shipped over the Pennsylvania Railroad from East St. Louis to Baltimore, arriving in Baltimore on the third day, was from nine to eleven pounds. It was not shown that the witness had any special or peculiar knowledge enabling him to testify as an expert upon the cause of such shrinkage, and we discover no error in this ruling of the court.

The fifth and last exception is to a question asked Dr. Embree, a veterinary surgeon produced as a witness by the defendant, who had testified as to the effect of transportation on hogs and other live stock. He was asked: "Doctor, in your opinion, based upon your experience, tell us as to whether or not the confinement of twenty-four hours is sufficient time to tire hogs or wear them out?" The only object and purpose of this question would seem to be to ascertain the effect of the additional twenty-four hours in transportation on the hogs. The question as framed would not ordinarily be so understood, and it was not so understood by the witness, as disclosed by his answer, for in his reply to the question he said: "We would all admit that hogs are tired after being in the car twenty-four hours, but I would not say that it would wear them out or be injurious to them. The government specified that a hog can be held in the car twenty-eight hours without food, water or rest," and "are shipped sometimes where they are unloaded five times in transit from our Central States to the Pacific Coast. These hogs were only unloaded twice." The question as framed, we think, was not a proper one, but in view of the answer thereto, we do not think the error is a reversible one.

Because of the errors we have pointed out in the court's rulings upon the prayers, the judgment will be reversed.

*Judgment reversed, and new trial awarded, and costs to be paid by the appellee.*