ELEAZER WINAKUR *v.* MILDRED G. SAPOURN
[No. 2, January Term, 1929.]

*Decided March 19th, 1929.*

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

664

*Randolph Barton, Jr.,* and *Louis Mitnick,* for the appellant.

*George Arnold Frick* and *Abram C. Joseph,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This is an appeal from a judgment on a verdict for the defendant, in an action of replevin for a used automobile brought by Eleazer Winakur, the appellant, against Mildred G. Sapourn, the appellee, in the Baltimore City Court.

There is in the record evidence tending to show facts which may be thus stated: Eleazer Winakur is a money lender operating in Baltimore City. Louis Sachs, trading as the "Sachs Auto Exchange" was a "dealer," trading in automobiles, also in Baltimore City, where he maintained a fixed place of business.

Some time prior to March 18th, 1927, Mildred G. Sapourn bought a used Willys-Knight automobile from Sachs. It proved unsatisfactory, and Sachs agreed to take it back in part payment for a Peerless sedan, which he agreed to sell her for fifty dollars more than she had paid for the first car, and he took from her two notes, each for twenty-five dollars, covering the difference in the price of the two cars. Sachs had bought and paid for the sedan with his "own money," but as soon as he secured the title to it he executed to Winakur a bill of sale on it and other cars in the following form:

"For and in consideration of the sum of twelve hundred fifty 00/100 dollars, the receipt whereof is hereby acknowledged, Louis Sachs, trading as Sachs Auto Exchange, of the City of Baltimore, in the State of Maryland, doth hereby bargain, and sell, assign and transfer under Eleazer Winakur of said City and State, all the following chattels, all contained and being in the premises No. 1112 Cathedral Street, in the said City, namely; * * * Peerless Sedan Eng. No. 8V1940, Ser. No. 352092, Md. Title No. 804450—700.

"And the said assignor doth warrant that the same are free of all liens, claims and encumbrances, and

agrees to warrant the same generally of and from all claims and demands of all persons whomsoever.

"Witness the hand and seal of said assignor, this 18th day of March, 1927."

That instrument was properly signed, sealed, and acknowledged by Sachs, contained an affidavit by Winakur as to the *bona fides* of the consideration, and, on March 21st, 1927, was recorded among the Chattel Records of Baltimore City.

On the same day, Winakur and Sachs executed the following agreement, which they referred to as a "consignment agreement," and which covered the sedan sold to Mrs. Sapourn:

"This memorandum of consignment, between Eleazer Winakur of the one part, and Louis Sachs, trading as Sachs Auto Exchange, of the other part, both of the City of Baltimore in the State of Maryland.

"Witnesseth, that the said Eleazer Winakur has left and doth hereby leave in the possession of said Sachs, at the premises No. 505 and 507 North Howard Street, in said City, the City, the following chattels namely (cost value for purposes of this memorandum):

(Description of chattels.)

"And it is agreed, that said Sachs shall be permitted to hold said chattels, and to sell them in the usual course of business and within 90 days from the day of the date hereof either redeliver the same to the consignor or to pay to Eleazer Winakur out of the proceeds of sale the cost value for the purposes of this memorandum as shown in this memorandum, and also to pay him monthly $3\frac{1}{2}$ per cent. per month thereon from the date of this memorandum, and the balance of the proceeds of sale to be retained by said Sachs, the said Eleazer Winakur to receive said money payable to him absolutely net to him, and all costs and expenses whatsoever, to be borne by said Sachs, and nothing herein contained to in any manner infer any partnership between the parties hereto, the relation being distinctly that of consignor and consignee, set-

tlement as above to be made immediately upon sale of said chattels.

"And the said Eleazer Winakur reserves the right at any time without notice to take possession of said chattels and terminate said consignment.

"And the consignee to keep insured against loss by fire, at his own expense, all of said chattels and the said chattels to be generally at the risk of the consignee until and unless actually delivered to the consignor.

"Said chattels shall not be removed from said premises without the consent in writing of the consignor."

Sachs also delivered to Winakur a certificate of title issued to him by the motor vehicle commissioner for the sedan, endorsed by him in blank. When he sold the automobile to Mrs. Sapourn, the title to it stood on the books of the motor vehicle commissioner in the name of Sachs, but the certificate was in the possession of Winakur. Sachs could not get the certificate from Winakur without repaying him the money which he had loaned on the car, and he could not transfer the title to it to Mrs. Sapourn unless he produced the original certificate, or accounted for its loss. He did not want to pay Winakur, but he did want the money which had been paid for the Peerless car by Mrs. Sapourn, and he could not keep that money without giving her a title to the car. In that situation he went to the commissioner of motor vehicles and represented to him that the original certificate had been lost, and by that false representation procured a duplicate, which he transferred to Mrs. Sapourn.

The record does not indicate that Winakur knew anything of the negotiations between Sachs and Mrs. Sapourn for the sale of the Peerless car until after it had been sold and delivered to her, but, shortly after he did learn of it, he brought this action of replevin for its recovery.

The appellee appeared to the action and pleaded (1) *non cepit*, (2) that the plaintiff had no property in the goods replevined, and (3) that the property therein was in the defendant. The plaintiff joined issue on the first plea, and traversed the second and third. The defendant then joined

issue on the traverse as to each plea, and the case was tried on those issues.

The record presents sixteen exceptions. The sixteenth embodies appellant's objection to the court's rulings on the prayers as well as to its refusal to strike out certain evidence. The others relate to rulings upon questions of evidence.

Since all of these exceptions involve the conflicting theories of the parties to this appeal as to the plaintiff's right to recover, before dealing with the exceptions we will state those contentions:

Appellant's contention appears to be that, by virtue of the recorded bill of sale, Winakur at the time of the sale was the technical legal owner of the automobile sold to Mrs. Sapourn, that she had constructive notice of that fact, that Sachs had no title to it which he could convey to her, and that consequently, as against Winakur, she took no title to it from or through Sachs, and that these conclusions are not affected by the "consignment" agreement.

Appellee, on the other hand, contends that the bill of sale was not intended to effect an outright sale of the property, but was designed to transfer the ownership in it to secure the repayment of a debt, that the consignment agreement operated as a defeasance, and that, since it was not recorded, the recordation of the bill of sale did not, under Code, art. 21, sec. 55, art. 66, sec. 1, afford constructive notice of Winakur's interest in the property; and that since Winakur, by suffering Sachs to be in possession of apparently valid *indicia* and muniments of title, made it possible for him to mislead the purchaser into believing that he was duly authorized to sell it, that he should bear such loss as resulted from the transaction. So that the actual issues of fact arising from these contentions, are: (1) Was the transaction under which Sachs transferred to Winakur title to the chattel a loan, or an outright sale? (2) If it was a loan, did the "consignment" agreement operate as a defeasance? (3) Had Sachs under the agreement actual authority as Winakur's agent to sell the car? And, (4) if he had not, was Winakur by his conduct estopped from asserting that fact?

With these contentions and issues in mind we will return to the exceptions.

Irving Sachs, manager of the Sachs Auto Exchange, was called as a witness by the defendant. In the course of his examination, in describing the course of business of the Sachs Auto Exchange, he had said that "money was borrowed" with which to buy cars, and he was then asked, "From whom did you borrow the money?" That question was objected to on the ground that whether the "money" was in fact "borrowed" was a question of law. The objection was overruled, and the witness answered "Mr. Winakur." He was then asked "Just tell us how you got the money from the different people," and he answered: "Well, in this particular case I bought this Peerless automobile I think I paid seven hundred dollars for it, and I issued a check of the Sachs Auto Company payable to the man I bought the car from. The man I bought the car from assigned the title to the Sachs Auto Company, and I then pledged the car to Mr. Winakur." Plaintiff then moved to strike out the word "pledged" from the answer. That motion was overruled, and those rulings are the subject of exceptions one and two. The apparent purpose of the examiner in asking these questions was to show the general course of business of the witness, to show that he had been accustomed to buy cars on borrowed money and pledge them for the loan, on the theory that, if he had pursued that course in other cases, it was more likely that he had followed it in this case. And while the objection to these two questions was based on the proposition that the witness, in using the words "borrow" and "pledge," stated conclusions of law and not facts, and did not necessarily raise the question of the relevancy of the evidence, it was raised in subsequent exceptions, and may be considered at this time. The exceptions pertaining to that general purpose fall into two groups, one, where the questions were designed to show that in many transactions, similar to that under consideration, Winakur had in fact loaned money to Sachs with which to purchase automobiles, and that in such instances Sachs had pledged them to

Winakur as security for the repayment of the loan. If, in fact, in such cases, the form of the transactions was substantially identical with that followed in this case, and each was merely one of a connected series of transactions which were uniformly regarded both by Winakur and Sachs as a pledge of a chattel to secure the repayment of a loan, such a course of business would throw some light on the intention of the parties in respect to the instant transaction, and would be relevant and admissible. *Jones on Evidence,* secs. 130, 140, 145.

The other group embraces questions intended to show dealings and transactions between Sachs and persons other than the appellant. Such testimony was clearly irrelevant and should not have been admitted, for it had no possible connection with or relation to any issue in the case. *Jones on Evidence,* sec. 140. The fact that Sachs had on occasions borrowed money from one person certainly did not prove that on some other occasion he had borrowed money from another person, when such persons had no connection or relation with each other, nor did it prove that Sachs and Winakur intended the bill of sale under consideration to operate as a chattel mortgage.

Returning to the first and second exceptions, we find no force in the verbal criticism of the questions and answers involved in them. For reasons to be presently stated, the true character of the transaction between Winakur and Sachs was open to inquiry in this case, and, when Sachs said that he borrowed the money specified in the bill of sale from Winakur, he was not stating a conclusion of law, but what he alleged to be a fact; nor was the question objectionable on the ground of relevancy. It was one of a series of questions relating to the course of business between Winakur and Sachs in a number of transactions similar in form and substance to that in issue here, which, together, were parts of a general scheme or plan, and which shed some light on the intention of the parties as to the transaction in issue here, and we find no error in the ruling involved in the first exception.

For reasons already stated, the answer which is the subject of the second exception was irrelevant, but as the motion to strike it out did not reach that objection, that ruling was also free from error, because in using the word "pledged" the witness was merely stating what he contended to be a fact.

The third, fourth, sixth, seventh, eighth and ninth exceptions present objections to the admission of testimony concerning transactions between Sachs and persons other than Winakur, unrelated to any issue in this case, and with which Winakur had no connection. For reasons already stated, this testimony was irrelevant and should not have been admitted, and there was error in these rulings.

The fifth, tenth, eleventh, twelfth, thirteenth and fourteenth exceptions related either to questions referring to transactions between Winakur and Sachs concerning cars other than that under consideration here, but which were nevertheless similar to the transaction involved in this case, and were parts of an alleged general plan or scheme, or to questions relating to this particular transaction. Without referring to them *seriatim*, it is sufficient to say that, for reasons stated above, we find no error in the rulings as to them.

At the close of the whole case, the appellant moved to strike out "all testimony in the case admitted subject to exception, tending to prove that the car replevined in this case was pledged with the plaintiff merely for the purpose of a loan for indebtedness of Louis Sachs." The motion was overruled, and that ruling was the subject of the fifteenth exception.

A similar motion is embodied in the sixteenth exception, which also presents appellant's objections to the court's rulings on the prayers. Whilst it is improperly included in that exception (*Harris v. Hipsley,* 122 Md. 436; *Lockerman, Garnishee v. Eastern Shore Trust Co.,* 146 Md. 347), and will not be considered in connection with it, it nevertheless, as presented by the fifteenth exception, raises the principal question in the case, which runs through all of the rulings

on the prayers, and it will therefore be considered in connection with them.

The appellant (plaintiff below) offered seven prayers, of which the fifth and seventh were modified and granted as modified in connection with the defendant's second and seventh prayers, the sixth was granted as offered, and the others refused. The defendant offered eight prayers, of which the second was modified and granted in connection with plaintiff's fifth modified prayer, and the seventh was modified and granted, and the others refused. The plaintiff excepted specially to the second, third, fourth, fifth, sixth, seventh and eighth prayers of the defendant, on the ground that there was no evidence in the case legally sufficient to support the hypothesis of said prayers, and the defendant specially excepted to the plaintiff's first, second and fifth prayers. For reasons which will be stated in dealing with the general exceptions to the court's rulings on the prayers, there was no error in overruling plaintiff's special exceptions, and the defendant's exceptions were too general to present an issue, and were also properly overruled. *Hatton v. McClish*, 6 Md. 417.

As stated above, appellant's contention is that the bill of sale vested the legal title to the chattel in Winakur, that its recordation charged Mrs. Sapourn with notice of its existence, that the consignment of the chattel to Sachs gave him no right to sell it, that all evidence of any agreement to the contrary, and all evidence of transactions between Sachs and Mrs. Sapourn, was irrelevant and inadmissible. But these views, while very earnestly and forcibly pressed upon this court, have in our judgment no substantial support either in reason or precedent, and must be rejected.

The mere fact that the bill of sale was absolute in form and purported to transfer the complete ownership of the chattel to Winakur did not exclude an inquiry into its real character, if, in fact, it was intended only as a pledge to secure the repayment of a debt (*Booth v. Robinson*, 55 Md. 450; *Laeber v. Langhor*, 45 Md. 481; *Grove v. Rentch*, 26

Md. 379), and that it was so intended may be shown by parol evidence. *Booth v. Robinson, supra.*

The recordation of such an instrument in compliance with the recordation statutes affords constructive notice of its contents to all persons who may be affected by it (*Finance & Guaranty Co. v. Defiance Motor Truck Co.,* 145 Md. 94), unless its effect is limited by some other instrument intended as a defeasance which is not recorded, in which case the person for whose benefit it was made takes no benefit from the recording thereof, and such record does not give constructive notice of its contents to a subsequent *bona fide* purchaser. *Owens v. Miller,* 29 Md. 159; *Code,* art. 66, sec. 1.

That the consignment agreement in this case was intended as a defeasance, as that word is used in the statute, is beyond question, when it is considered in connection with the testimony of Winakur and Sachs. Winakur testified in part as follows: "Did you ever finance a man named Louis Sachs who traded as the Sachs Auto Exchange in connection with the purchase of cars? A. Yes. * * * What was the course of dealing? (The witness) The course was I finance every car he buys. He bought a car and paid seven hundred dollars. I used to give him a check for seven hundred dollars to pay for the car, and we had an agreement between us, and besides I had a bill of sale on the car, or several cars, if I financed several cars in the same transaction, and had the same paper the same day or next day recorded. Q. That would be the bill of sale and you would put up the full purchase price of the cars? A. Yes. He never put in a penny. Q. He would give you the bill of sale. After that was done, what would be done with the car? A. The car was put in his garage to sell, with the understanding * * * (Mr. Barton) Did you ever have a written paper showing what the understanding was? A. Yes. Q. In this particular case was the same course followed? We will offer the paper. Did you have a bill of sale? A. Yes. * * * Q. You are the plaintiff in this case, are you? A. Yes. Q. And the car bought was what kind of a car? A. Peerless sedan. Q. Did you finance this car for Mr. Sachs? A. Yes.

* * * Q. They bought and sold cars. That is the only business they were engaged in? A. Yes. Q. And you permitted them to have possession of this car? A. According to my contract, yes. Q. Well, you did permit them to have it? In fact, you permitted them to have it? A. To have the car to try to sell it. Q. And you gave it to them for sale, didn't you? A. What? Q. You gave it to them for sale? A. If they sold it they had to pay mé. Q. It was sent there for the purpose of being sold? A. Yes. * * * You knew he was selling those cars in the usual course of business, didn't you? A. Yes. * * * Q. Although the transaction in substance was the same, didn't you use a different form of paper? As a matter of fact, didn't you change your form from bill of sale to chattel mortgages? A. Well, we done that only once or twice. Mr. Sachs came up and bought about eleven or twelve cars, and I didn't want to take any more cars in, and I told him the only way I would take the cars in was by providing they were put in my storage garage, and that time I made a chattel mortgage. * * * Q. Well, the matter came to you the same way? A. He said he had certain cars and asked me if I was going to finance them. * * * Q. That was a loan, wasn't it? A. I was figuring the car belongs to me when I had them in my garage. I figure they are my own cars. * * * In one case Sachs kept possession of the cars, and where the mortgage form was used you had possession? A. One form was in accordance with the agreement with Mr. Sachs that I was financing cars, and he could keep them for ninety days, and couldn't move them without my consent, but he had to come up and pay me for the cars. That was my agreement." And Sachs was even more explicit in his statement that the transaction was a loan and that the car was pledged for its repayment. That testimony, while inconsistent with the theory of an absolute sale, was not contradicted in any essential element, and is consistent with the terms of the so-called "consignment" agreement. Under that agreement the car was permitted to remain in the possession of Sachs, who was authorized to sell it "in the usual course of business," and to

"repay" to Winakur out of the proceeds of sale "the cost value," which was the amount advanced by Winakur, to pay Winakur interest on that amount at the rate of two and one-half per centum per month (erroneously stated in the agreement as three and one-half per cent.), and to retain any surplus remaining after such repayments. Such an agreement operated to defeat the bill of sale, and must be regarded as a technical defeasance. *Hoffman v. Gosnell,* 75 Md. 589; *Bouvier Law Dict.; Words and Phrases,* 1st, 2nd and 3d Series; *Joseph v. Winakur,* 30 F. (2nd) 510. Since, therefore, there was in the case evidence tending to show that the transaction between Winakur and Sachs as to the sedan sold to the appellee was intended to operate as a chattel mortgage, and that the unrecorded "consignment" agreement was intended to operate as a defeasance thereof, there was evidence legally sufficient to show that the record of the bill of sale did not give constructive notice of its contents, and, assuming the truth of the evidence leading to that conclusion, the bill of sale may be wholly disregarded.

But, if we disregard it, the situation was this: Winakur, although he had endorsed in blank, in his possession, the certificates of title issued by the commissioner of motor vehicles certifying that the title to the automobile was in Sachs, not only failed to notify the commissioner of the change in title, but knowingly suffered the automobile to be in Sachs' possession, and to be by him exposed for sale with a number of other automobiles in Sachs' place of business, where, according to the course of his business, they were indiscriminately offered for sale to the public. And the question is whether, under such circumstances, when Sachs sold the car to an innocent purchaser without notice for value, and was enabled by Winakur's conduct, in failing to inform the commissioner of motor vehicles of his interest in it, to transfer to such purchaser a title to it apparently good, Winakur can now be permitted to attack the purchaser's title, thus obtained, to the chattel.

That question, strictly speaking, does not turn on the question of agency, first, because as between Winakur and

Sachs the scope of Sachs' agency was limited by the "consignment" agreement, which, while it allowed Sachs to sell, did not authorize him to deliver the chattel sold until Winakur had received the amount which he had loaned on it, or had given his written consent to the delivery; second, the appellee bought the automobile from Sachs in the belief that he himself was the owner and not the agent for an undisclosed owner. For while, if in fact Sachs had been authorized to sell and deliver the car, that authority would be regarded as conclusive, that is not this case. But it turns rather on whether Winakur, in consequence of his own conduct, is not estopped from asserting that Sachs was not, as he appeared to be, the owner of the chattel. Code, art. 83, sec. 44 (section 23, Uniform Sales Act) provided in part: 'Subject to the provisions of this sub-title, where goods are sold by a person who is not the owner thereof, and who does not sell them under the authority or with the consent of the owner, the buyer acquires no better title to the goods than the seller had, unless the owner of the goods is by his conduct precluded from denying the seller's authority to sell." That provision has been before the courts in comparatively few cases, although the principles involved in it have long been recognized.

In *Truck, Tractor & Forwarding Co. v. Baker,* 281 Pa. 145, it appeared that the tractor company leased a truck to one Baker under a so-called lease, providing for the payment of monthly instalments, and a return of the truck upon default, and on the same day assigned the lease to the Commercial Investment Company, a financing corporation. Baker defaulted, the tractor company recaptured the truck, and placed it in its salesroom for sale, where it remained until it delivered it to one Langford upon a similar leasing agreement executed by it as. lessor. Langford made the payments required by the agreement to the tractor company for six months, when the finance company replevined the truck on the theory that the tractor company had no right to lease it. While the court in that case found that the tractor company acted as agent of the finance company, it laid

down this principle, which ultimately controlled the decision: "Plaintiff permitted the truck to remain in possession of the tractor company, and apparently clothed it with authority to dispose of the same, and must abide by the consequences. This question is fully considered in the opinion by Mr. Justice Kephart in *Commercial M. Mtg. Corp. v. Waters*, 280 Pa. 177, and it is there stated that 'Where the owner so clothes another with apparent ownership, or authority to act, as to mislead or deceive the public, an estoppel may arise against the owner'—citing *O'Connor v. Clark*, 170 Pa. 318, *supra; Little v. Fearon & Co.*, 252 Pa. 430; *Leitch v. Sanford Motor Truck Co.*, 279 Pa. 160." In *Sherer-Gillett Co. v. Long*, 318 Ill. 432, it was held that mere possession of a chattel by a vendor who sold without actual authority would not estop the true owner from claiming the chattel from the vendee, unless the possession was accompanied by some *indicium* of ownership or the right to sell. That statement was elaborated in *Drain v. La Grange State Bank*, 303 Ill. 335, where it was said: "While that is true, an estoppel may operate against the person claiming what would otherwise be the better title, and this is based upon conduct of the true owner by which he allows another to appear as the owner of, or having full power of disposition over, property, so that an innocent third person is led into dealing with an apparent owner. The estoppel does not depend upon where the actual title is, but rests upon the act of the real owner, which precludes him from disputing the existence of a title which he has caused or allowed to appear to be vested in another. * * * An innocent purchaser will be protected, without regard to the terms of the contract of sale, where the appearance of ownership is in one, while the title is really in another, or there is a secret lien. * * * Clothing another person with the indicia of ownership does not mean simply giving possession of a chattel."

These general principles are, so far as we know, unquestioned anywhere, but the difficulty in applying them lies in measuring the facts relied upon to show (1) apparent ownership, or (2) an apparent right to sell, and on that question

the decisions are not in entire harmony. But the decided weight of authority supports the rule that, where one sends a chattel to another whose business it is to sell similar articles, and permits it to be exposed for sale in his salesroom, where it and other similar articles are indiscriminately offered for sale, and there is nothing to indicate any limitation on his right to sell it, and no record affording constructive notice of any lien on, or title to, it in any person other than the person offering it for sale, that a *bona fide* purchaser without notice from such person obtains a title superior to that of the true owner.

One of the earliest cases on the subject is *Pickering v. Busk*, 15 East, 43, where Lord Ellenborough said: "Strangers can only look to the acts of the parties, and to the external *indicia* of property, and not to the private communications which may pass between a principal and his broker; and if a person authorize another to assume the apparent right of disposing of property in the ordinary course of trade, it must be presumed that the apparent authority is the real authority. * * * If the principal send his commodity to a place where it is the ordinary business of the person to whom it is confided to sell, it must be intended that the commodity was sent thither for the purpose of sale. If the owner of a horse send it to a repository of sale, can it be implied that he sent it thither for any other purpose than that of sale? Or if one send goods to an auction room, can it be supposed that he sent them thither merely for safe custody? Where the commodity is sent in such a way and to such a place as to exhibit an apparent purpose of sale, the principal will be bound, and the purchaser safe." And while Prof. Williston, in his work on *Sales,* sec. 314, criticises possible implications involved in that statement, he does not dispute that as to the supposed case it was sound. A conclusion apparently different was reached in *State Bank v. Johnson,* 104 Wash. 550, 3 A. L. R. 235, but that conclusion, in so far as it conflicts with Lord Ellenborough's statement of the rule, was rejected in *Boice v. Finance & G. Corp.,* 127 Va. 563, 10 A. L. R. 654, where the court

was dealing with the rights of the mortgagee under a duly recorded chattel mortgage upon an automobile which formed part of the stock of a dealer, who sold it to an innocent purchaser, and in that case it was decided, after an exhaustive examination of the authorities, that "It is true that, as a rule, the seller of personal chattels cannot confer upon a purchaser any better title than he himself has; but if the owner stands by and permits a seller, who is a licensed dealer in such goods, to hold himself out to the world as owner, to treat the goods as his own, place them with other similar goods of his own in a public showroom, and offer the same indiscriminately with his own to the public, he will be estopped by his conduct from asserting his ownership against a purchaser for value without notice of his title." And in *Glass v. Continental Guaranty Co.,* 81 Fla. 697, 25 A. L. R. 317, the court, in considering the rights of a vendor under a conditional sales contract against an innocent purchaser for value of an automobile covered by such contract, who had purchased it from a dealer to whom the owner had consigned it, said: "But where an owner consigns personal property to a dealer in such goods, with express or implied authority to sell, or delivers or consigns to another personal property with *indicia* of ownership, or of authority to sell, but with title reserved in the owner until the payment of the purchase price, a purchaser who pays value for such goods and gets possession thereof without notice of the terms or conditions of the original delivery, consignment, or sale, obtains a good title as against the original owner, which will in general prevail against the latter's reserved title. See *Bent v. Jerkins,* 112 Ala. 485; 24 *Am. & Eng. Enc. Law* (2d Ed.), 1165; *Mechem, Sales,* secs. 157, 165; 35 *Cyc.* 680; *American Process Co. v. Florida White Pressed Brick Co.,* 56 Fla. 116. Where one of two innocent parties must suffer through the act or negligence of a third person, the loss should fall upon the one who by his conduct created the circumstances which enabled the third party to perpetrate the wrong or cause the loss."

But it is not necessary in this case to go so far as those

decisions would carry us, and we intentionally refrain from approving them in so far as they derogate from the rights of one who holds a lien on or title to a chattel under an instrument duly recorded, where under the statutes such record charges persons affected with notice of the existence and contents of the instrument. For here there is evidence from which it may be inferred that not only did Winakur permit the automobile to remain for sale in the salesroom of Sachs, who was a licensed dealer, as one of a number of other automobiles which were indiscriminately offered for sale by him, but he permitted Sachs to appear on the books of the commissioner of motor vehicles as the true owner thereof, and, by his failure to warn that official of the interest which Winakur had in the car, he enabled Sachs to obtain a duplicate title certificate showing title in him and to exhibit it to the purchaser. Such conduct in our opinion amounted to an estoppel within the meaning of Code, art. 83, sec. 44, and prevents the appellant from successfully contesting appellee's title to the automobile taken under the writ of replevin issued in this case.

As the plaintiff's rejected prayers were inconsistent with this conclusion, they were properly refused, and for the same reason his motion to strike out certain testimony which is the subject of the fifteenth exception was properly overruled.

As stated, the plaintiff's fifth modified prayer was granted in connection with defendant's second and seventh modified prayers. While the composite instruction thus granted is not as clear as it might have been, it did, in substance, with approximate accuracy set out the contentions of the parties and such available defences as appellant claimed, and in our opinion there was no reversible error in the rulings as to those prayers. It was not suggested in this court that the appellant was in any way injured by the act of the court in modifying his second and seventh prayers, and after a careful comparison of the original and modified prayers those rulings are in our opinion free from error.

As stated, there was error in the rulings involved in the

third, fourth, sixth, seventh, eighth and ninth exceptions, which related to the admission of testimony as to the course of dealing between Sachs and persons other than Winakur. The only effect which such testimony could have had upon the minds of the jury was to support appellant's contention that the transaction between Winakur was a loan and not a sale, and since there was other positive testimony supporting that contention, and since the evidence improperly admitted was unimportant if not meaningless, we cannot believe that it could possibly have influenced the verdict of the jury, and we are unwilling to reverse the judgment because of those errors, and it will therefore be affirmed. *Carter's Digest,* title "Appeal," sec. 447 *et seq.*

*Judgment affirmed, with costs.*