## MATHIESEN ALKALI WORKS, INC. *v.* CHARLES E. REDDEN

[No. 16, January Term, 1940.]

*Decided January 25th, 1940.*

The cause was argued before BOND, C. J., OFFUTT, SLOAN, MITCHELL, JOHNSON, and DELAPLAINE, JJ.

*L. Wethered Barroll* and *Jesse Slingluff, Jr.*, with whom were *William L. Marbury, Jr.*, and *Marbury, Gosnell & Williams*, on the brief, for the appellant.

*Max Sokol,* with whom were *M. William Adelson* and *Dickerson, Nice & Sokol* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This is an action brought by Charles E. Redden against the Mathiesen Alkali Works, Inc., to recover damages for injuries which he sustained in a collision between a truck driven by him and a truck owned by the defendant and operated by its employee. The trial resulted in a verdict and judgment for the plaintiff, and from that judgment the defendant took this appeal. Liability was admitted, so that the only issue in the case was the amount of damages which the plaintiff was entitled to recover.

The record submits three exceptions, of which one relates to a question of evidence, and the others to the court's action on the prayers.

There was in the case evidence of the facts stated in the following narrative: On January 15th, 1939, Redden was employed as a salesman for the Kress Farm Dairy, and on that day, in the course of his employment, was driving a delivery truck south on Poplar Grove Street in Baltimore City. At Lafayette Avenue he stopped the truck about ten feet behind a standing street car, which had stopped to take on and discharge passengers. While it was stationary and in that position, defendant's truck crashed into the rear of it, causing plaintiff's head to strike against a panel, apparently part of the truck cab behind him. As a result of the blow he suffered injuries which he described in the following testimony:

"After the accident I made several stops and took my truck back to the Kress Farm Dairy garage. I then went home with a severe headache and my nose started to bleed. I stayed at home, went to bed, and stayed there for four days. A. My head and ear both hurt me so much that I—Q. Your head and ear both hurt you? What ear? A. Left ear. Q. Had you any trouble with that ear before? A. No, sir. Q. How long did your nose bleed, how long did that continue? A. That continued up till July 17th. Q. You mean you had nose bleeds up

till July 17th? A. Yes, sir. Q. How long was it before you had your doctor's attention? A. I went to see Dr. Wilkerson four days after the accident, and he has been treating me since then. Q. How frequently? A. Three times a week. Q. Are you still going for treatment? A. Yes, sir. Q. What trouble has he been treating you for? A. He has been treating me for these headaches, and nose bleeds, and the trouble with my left ear. Every time I talk it reflects in my left ear. Q. Had you had any trouble with your head, and nose bleed and ear, before this accident? A. No, sir. * * * Q. Did you lose any time from work? A. I lost three and a half weeks. Q. When? A. From April 10th to May. Q. What happened then, why did you lose time then? A. Because I couldn't keep up with my job, made mistakes. Q. Why were you making these mistakes? A. Because I had severe headaches and trouble with my ear. Q. How long did you stay off at work? A. About a month. * * * Immediately after the accident I made several stops making deliveries, on my way back to my place of business. I finished my route that day. The only trouble driving I had was with the headaches."

Dr. Albert Russell Wilkerson, who first treated Redden, saw him on January 19th, 1939. At that time Reden complained of headache and nasal hemorrhages, and his examination revealed a hematoma and a blood clot over the occipital region at the back of his head, which was tender under pressure, and he concluded that he had had a cerebral concussion. Redden also complained of trouble with his left ear, but the witness, "so far as he could see from internal evidence of the ear," found no evidence of injury there and referred him to Dr. E. Wilson Sickel, an ear specialist. Dr. Sickel examined him on April 27th, 1939, and testified that he found at that time that Redden had suffered a sixty per cent loss of hearing in the left ear. He was then asked if he had heard Redden's testimony that he had no trouble with the ear before the accident, and answered that he had, and that he had also heard "the description"

of the accident. He was then asked this question: "Assuming to be true the fact that he did not have any trouble with his ear before the accident, and assuming to be true all the facts concerning the accident that you heard, state whether or not there is any causal connection, in your opinion, between the accident and the ear condition you found?" An objection to the question was overruled and an exception noted. The witness thereupon answered: "Assuming these facts to be true, it was very very possible, or probable, that the accident was the cause of the loss of hearing." A motion to strike out that answer was granted and the court said: "He didn't ask you whether it was possible, he asked you what was your opinion," and the witness said "My opinion is that the loss of hearing came from the accident."

Those rulings are the subject of the first exception. The appellee suggests that the exception is confusing and presents no clear legal question, and inferentially that it is repugnant to the rule that each bill of exception may only submit one question of law, and may not embrace distinct and several matters. But the rulings all related to a single question and a single matter, which was, whether the facts hypothesized in the question constituted a sufficient basis for the formulation of the opinion which it requested. The question was purely and essentially hypothetical. It was based on no knowledge which the witness had acquired from his own examination, but exclusively (a) upon the assumption that the plaintiff had had no trouble with his ear before the accident, and (b) that the facts which the witness had heard concerning the accident were true. Now while it is true that the witness had stated that he had heard "the description of the accident," he had not stated that he had heard any description of plaintiff's injuries, nor did it appear from any other testimony in the case that he had heard them described. He did not see the plaintiff until more than three months after the accident, he had no first hand knowledge of its immediate effects, and a mere description of the accident could have furnished no infor-

mation of its effect on the plaintiff. So that the only factual basis for the opinion requested was that plaintiff's hearing had been normal before the accident, and that he had suffered a sixty per cent loss of hearing when witness examined him three months later, and that at the time of the accident he had banged the back of his head against the truck cab. Reduced to its lowest terms, the hypothesis was that plaintiff had received a blow on the head, and that three months later he was found to be partially deaf in one ear, and that prior to the accident his hearing had been normal. Obviously those naked, disconnected, facts were not sufficient to permit any rational conclusion that there was a causal connection between the accident and the deafness. There was, it is true, evidence in the case of other facts which, taken in connection with those hypothesized in the question, would have been sufficient basis for such an opinion, but the question did not refer to them, and we were dealing with the question.

A hypothetical question addressed to an expert, concerning some matter within the range of his special knowledge or skill, must embrace within its hypothesis every material fact in evidence essential to the formulation of a rational opinion concerning the matter to which it relates, but may not include any fact not in evidence. *May Oil Burner Corp. v. Munger,* 159 Md. 605, 620, 152 A. 352; *Owings v. Dayhoff,* 159 Md. 403, 151 A. 240; *Mangione v. Snead,* 173 Md. 33, 47, 195 A. 329; *Gordon v. Opalecky,* 152 Md. 536, 546, 137 A. 299; *Quimby v. Greenhawk,* 166 Md. 335, 338, 171 A. 59; *Pennsylvania R. Co. v. Lord,* 159 Md. 518, 523, 151 A. 400. If it offends in either respect it is bad. The question under consideration omitted (a) any direct reference to plaintiff's injuries (because the word "accident" does not embrace within its meaning injuries resulting from the accident, *Words & Phrases, Webster's Dictionary*), (b) to the fact that Dr. Wilkerson, who examined him four days after the accident, saw no evidence of injury to the ear, (c) to the fact that he had no broken bones, (d) to

the fact that he finished his route after the accident, or (e) to the fact that he lost no time from work until April 10th, nearly three months after the accident. Because of those omissions the question was bad and objection to it should have been sustained. If the vice were merely formal, since there was no objection on that ground, the error might not be regarded as reversible (*Slime v. Hooper,* 164 Md. 244, 253, 164 A. 548; *Cronin v. Kimble,* 156 Md. 489, 496, 144 A. 698; *Buck v. Brady,* 110 Md. 568, 577, 73 A. 277), but it is more than that. It asks for an expert opinion upon stated facts which at most permitted a guess which the jury were as well qualified to make as the witness.

At the close of the whole case plaintiff offered a prayer allowing the jury, in estimating the damage which the plaintiff had sustained as a result of the accident, to consider whether the injuries were permanent in their nature, and at the same time the defendant offered a prayer instructing the jury "that in ascertaining damages they are to make no award whatever for permanent injuries." The court heard no argument on the prayers, and plaintiff's counsel thereupon began to argue the case to the jury, apparently before the court ruled on defendant's prayer. That procedure was in accordance with the ordinary practice of the presiding judge in cases where counsel for the parties agree to it. During the opening argument for the plaintiff, counsel for defendant intervened and asked to be heard on plaintiff's prayer. He was heard, the prayer was withdrawn, and another damage prayer substituted, which did not refer to permanent injuries in terms. Defendant is then said to have objected to the withdrawal of the prayer. Since it objected to the prayer itself, the reason for the objection to its withdrawal is somewhat obscure, but in the absence of any variance prayer, or special exceptions, oral or written, made when it was offered, and since defendant does not question the law of the prayer, and since it appears to have made no complaint or objection at the time to the action of the court in allowing counsel for the plaintiff

to begin his argument to the jury before it had ruled on defendant's prayer, there is really no question before this court as to the propriety of the court's rulings in reference to the plaintiff's prayers. The court properly refused the defendant's prayer. In form it was neither a demurrer to the evidence nor a variance prayer. But apart from that, the evidence in the case was undoubtedly legally sufficient to support a finding of permanent injury; therefore there was no error in granting either the plaintiff's withdrawn prayer, or the substituted prayer, so that defendant could not possibly have been injured by the withdrawal of that prayer even if the court erred in permitting its withdrawal. But there was no error in that ruling, since the matter rested in the sound discretion of the court.

It is unfortunate that a case which was in all other respects fairly tried must be reversed because of the error in the ruling involved in the first exception. But the question was material and vital, and the answer may well have influenced the jury in estimating the plaintiff's damages. The judgment must therefore be reversed.

*Judgment reversed and case remanded for*
*a new trial with costs to the appellant.*